Brewster H. Jamieson, ABA No. 8411122
Michael B. Baylous, ABA No. 0905022
LANE POWELL LLC
1600 A Street, Suite 304
Anchorage, Alaska 99501-5148
Telephone:   907.264.3325
                     907.264.3303
Email:       jamiesonb@lanepowell.com
                baylousm@lanepowell.com

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ANTHONY L. BLANFORD and JOHN K. BELLVILLE,<br><br>                              Plaintiffs,<br><br>        v.<br><br>MICHAEL J. DUNLEAVY, in his individual and official capacities; TUCKERMAN BABCOCK; and the STATE OF ALASKA,<br><br>                              Defendants. | Case No. 3:19-CV-00036-JWS<br><br>**DEFENDANTS' MOTION FOR**<br>**SUMMARY JUDGMENT** |

Pursuant to Federal Civil Rule 56(a), Defendants the State of Alaska (the "State"), Governor Michael Dunleavy, and Tuckerman Babcock move for summary judgment on all claims advanced by Plaintiffs.

## I.  INTRODUCTION

When he won the governorship, Governor Dunleavy and his chief of staff, Mr. Babcock, requested that at-will state employees tender resignations and indicate interest in continued service to Alaska. Mr. Babcock conveyed this request in a memorandum. The overwhelming majority of recipients—be they Democrats, Republicans, or unaffiliated—were retained in their positions after they tendered their resignations and indicated an interest in continued service. Dr. Anthony Blanford, Director of Psychiatry at the Alaska Psychiatric Institute ("API"), and Dr. John Bellville, an API

staff psychiatrist, were among the few who failed to resign. They were discharged as a result. That same week, the State offered to continue each doctor in his position, asking only that each say he wanted to remain. Dr. Blanford and Dr. Bellville refused to say this.

Instead, a few months later, Dr. Blanford and Dr. Bellville filed this suit, claiming the State, Governor Dunleavy, and Mr. Babcock violated their free speech rights under the federal and state constitutions and violated other state-law principles. Dr. Blanford alleges speech rights in his failure to resign and in a letter to the editor he wrote shortly before failing to resign. Dr. Bellville alleges only a right to fail to resign. Because each was discharged only for failing to resign, an omission without constitutional protection and unshielded by state law, the State, Governor Dunleavy, and Mr. Babcock respectfully request summary judgment on all claims.

## II. <u>BACKGROUND</u>[1]

### A. Request for Resignation and Statement of Interest

Governor Dunleavy won his office in the November 2018 general election. In the weeks before inauguration, the Governor's transition team selected staff for each of the executive departments the Governor is required to supervise. *See* Alaska Const. art. III, § 24.[2] In this effort, Mr. Babcock sent a memorandum to the State's at-will employees. The memo explained that Governor Dunleavy planned to bring "his own brand of energy and direction to state government." To facilitate the transition, the memo instructed recipients to "submit [their] resignation[s] in writing" by November 30, 2018. Employees who wished to remain in their current positions were to make resignations effective "upon acceptance by the Dunleavy administration," and to state interest in

---

[1] Exhibits cited herein are attached to the April 9, 2021 Declaration of Michael B. Baylous.

[2] *See also Bradner v. Hammond*, 553 P.2d 1, 6 (Alaska 1976) ("In addition to vesting the executive power of the state in the governor, Section 16 of Article III provides that '(t)he governor shall be responsible for the faithful execution of the laws.' In view of the responsibilities imposed by Section 16, and the authority granted by Section 1, the governor is necessarily clothed with the power to appoint subordinate executive officers to aid him in carrying out the laws of Alaska.").

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)                    Page 2 of 23

Case 3:19-cv-00036-JWS   Document 55   Filed 04/09/21   Page 2 of 23

continuing state employment. The memo made no reference to Governor Dunleavy's political party or any other party. Rather, it stated, "Governor-Elect Dunleavy is encouraging you and all Alaskans to submit their names for consideration for service to our great state," and it expressed an intent "to ensure that any Alaskan who wishes to serve is given proper and fair consideration."[3]

Accompanying the memo was a template for the resignation and statement of interest, which read:

> Please accept this letter as notice of my resignation from my position as [psychiatrist]. I understand my resignation shall be effective upon receiving notice from your administration.

> I [have] submitted my name for consideration for my current position to continue with the new administration.[4]

The day the memo was sent, the *Anchorage Daily News* reported statements from both Mr. Babcock and Governor Dunleavy. The paper reported Mr. Babcock as saying:

> [Governor Dunleavy] just wants all of the state employees who are at-will . . . to affirmatively say, "Yes, I want to work for the Dunleavy administration". . . . Not just bureaucracy staying in place, but sending out the message, "Do you want to work on this agenda, do you want to work in this administration? Just let us know" . . . . I do think this is something bold and different, and it's not meant to intimidate or scare anybody. It's meant to say, "Do you want to be part of this?" . . . If you don't want to express a positive desire, just don't submit your letter of resignation . . . . And then you've let us know you just wish to be terminated.[5]

The paper reported the Governor as saying, "We want to give people an opportunity to think about whether they want to remain in this administration and be able to have a conversation with us."[6]

---

[3] Ex. A.

[4] *Id.* at 3.

[5] Ex. B at 2.

[6] *Id.*

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)                    Page 3 of 23

Case 3:19-cv-00036-JWS   Document 55   Filed 04/09/21   Page 3 of 23

**B.**     **Dr. Blanford and Dr. Bellville's Employment**

Dr. Blanford and Dr. Bellville received the memo as psychiatrists at API, where Dr. Blanford served as Director of Psychiatry and Dr. Bellville was a staff psychiatrist.[7] "API is the State's only [public] psychiatric hospital and, as such, has a responsibility and obligation to provide [inpatient] services for those that need them."[8]

Dr. Blanford and Dr. Bellville served as a staff psychiatrists, and in 2017, Dr. Blanford was named Director of Psychiatry at a salary of $298,000 per year.[9] He had the third highest salary in the State's executive branch.[10]

Dr. Blanford's director position "was essential to the overall operation and accreditation" of API. He was responsible for "administrative management, and oversight of all medical, psychiatric, and clinical services." His duties included ensuring compliance with state law and fulfilling an "[a]ctive leadership role as [a] member of Alaska Psychiatric Institute Senior Management Team." Approval to hire both doctors came from a designee of the Governor's Chief of Staff.[11]

As part of the "senior executive team," Dr. Blanford reported directly to the CEO of API and was only one level removed from the Commissioner of the Department of Health and Social Services.[12] He was "responsible for ensuring that the patients . . . admitted to the hospital[] were safe, [and] cared for," truly, "a large responsibility."[13] He also had a role in proposing API policies to be presented to the Commissioner.[14] Some of

---

[7] Doc. 7-2 at 5 (Compl. ¶¶ 19–20).

[8] Ex. C at 3-4 (Jan. 7, 2021 Gavin Carmichael Dep. Tr. ("Carmichael Dep.") 13:16–19, 14:17–23).

[9] Ex. D.

[10] April 9, 2021 Decl. of Kate Sheehan ¶ 2.

[11] Ex. E.

[12] Ex. C at 4 (Carmichael Dep. 16:23–17:6, 17:21–23).

[13] Ex. C at 6 (Carmichael Dep. 22:20–22, 23:1–2).

[14] Ex. C at 7 (Carmichael Dep. 34:22–35:9).

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)                    Page 4 of 23

Case 3:19-cv-00036-JWS   Document 55   Filed 04/09/21   Page 4 of 23

API's policies were politically sensitive, including policies related to housing adolescents and policies related to admission criteria.[15] Funding for API was also politically sensitive.[16] Dr. Blanford's leadership included a "critical role" in responding to a Center for Medicare and Medicaid Services investigation of API.[17]

On many of these matters, Dr. Blanford would "help guide the process" of policymaking.[18] His input was about "very complicated," "not very transactional" topics.[19] And his advice depended on "a good relationship" with API's CEO, who reported directly to the Commissioner.[20]

Dr. Blanford also managed well over 100 staff, including doctors, nurse practitioners, physician assistants, and pharmacists.[21] This responsibility required him to balance his policy objectives with management. For example, he negotiated with the nurses' union to implement 24-hour staffing, persuading the union to accept 12-hour shifts.[22] He overcame "a lot of pushback" but prevailed "over time."[23]

## C. Dr. Blanford's Reaction to the Resignation Request

Shortly after receiving the resignation request, Dr. Blanford wrote a letter to the editor of the *Anchorage Daily News*. He said, "I will not be offering my resignation. Whereas it might seem like a simple matter to offer my resignation with the likelihood of being retained, this symbolic gesture of deference doesn't settle well with me." He explained that API required "adequate support and funding . . . from the Dunleavy

---

[15] Ex. C at 9 (Carmichael Dep. 51:24–53:22).

[16] Ex. C at 10 (Carmichael Dep. 54:18–55:60).

[17] Ex. F.

[18] Ex. C at 11 (Carmichael Dep. 65:20).

[19] Ex. C at 12 (Carmichael Dep. 66:24–25).

[20] Ex. C at 4, 12 (Carmichael Dep. 16:23–17:6, 17:21–23, 66:10).

[21] Ex. C at 6 (Carmichael Dep. 22:4–19).

[22] Ex. C at 11 (Carmichael Dep. 64:16–23).

[23] Ex. C at 11 (Carmichael Dep. 64:21–23).

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)                    Page 5 of 23

Case 3:19-cv-00036-JWS   Document 55   Filed 04/09/21   Page 5 of 23

administration." He stressed that "[p]olitics have already cut deeply into our ability to care for the mentally ill." Dr. Blanford concluded that his "moral allegiance is to the mentally ill and the staff who care for them." He said his "political allegiance" was not why he was hired, and he said that, before staying on as Director of Psychiatry, he would "like to know first if the incoming administration is invested" in improving mental health care in Alaska and at API.[24]

## D. Dr. Bellville's Reaction to the Resignation Request

Dr. Bellville and two other API doctors worried about "speculation" that Dr. Blanford would be terminated. They wrote to the Governor and Mr. Babcock to explain that Alaska was facing a mental health crisis with inadequate resources. They pointed to insufficient patient beds at API and concerns with patient and employee safety.[25] In addition, they lauded Dr. Blanford's ability to meet these challenges, saying he was "the only staff member who ha[d] administrative experience" and was "best suited to remain at the helm of API in the future." According to the three psychiatrists, Dr. Blanford "inspired the staff to come forward with ideas and initiatives to address" API's challenges.[26] Dr. Bellville and his co-signatories concluded their letter saying, "It is an honor to serve the people of Alaska and the patients who require care at API."[27]

## E. Failure to Resign, Discharge, and Declined Invitation to Return

Neither Dr. Bellville nor Dr. Blanford submitted the requested resignation letter. They knew this would lead to their discharge. API COO Gavin Carmichael asked them to reconsider, saying:

> So let me get this straight. So you guys are either going to resign or be terminated. And then I'm going to have to—you know it as well as I do. I'm going to have to drop the hospital

---

[24] Ex. G.

[25] Ex. F.

[26] Ex. F at 2.

[27] Ex. F at 3.

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)          Page 6 of 23

Case 3:19-cv-00036-JWS   Document 55   Filed 04/09/21   Page 6 of 23

capacity by 30 beds or so . . . . Come on now. Is that really in the best interests of the patients.[28]

Like other state employees who failed to resign, Dr. Blanford and Dr. Bellville were discharged on December 3, 2018.[29] Newly appointed Commissioner of Health and Human Services Adam Crum learned of Dr. Blanford's discharge later in the day and was told that it was because "he had not submitted a resignation."[30] The rest of the medical staff at API submitted their resignations and were retained.[31]

Commissioner Crum told both doctors in a meeting later that week that "if they wanted to stay, they just needed to tell me that they wanted to apply and they could have their—and they could stay on."[32] Reapply meant "they just had to tell me they wanted to take their job back."[33] Neither doctor expressed an interest. The State made other efforts to get the doctors to return to work.[34] But the doctors could not be persuaded to continue state employment.[35]

Instead of returning to work, Dr. Blanford and Dr. Bellville filed this lawsuit, alleging claims under 42 U.S.C. § 1983 for violation of the First Amendment, claims for violation of the Alaska Constitution's free speech right, and state-law violations of the implied covenant of good faith and fair dealing. They seek declarations that their rights were violated, reinstatement with backpay, an injunction barring future discharge, and damages from Governor Dunleavy and Mr. Babcock.

---

[28] Ex. C at 8 (Carmichael Dep. 42:1–5).

[29] Doc. 7-2 at 5 (Compl. ¶ 42); April 9, 2021 Decl. Tuckerman Babcock ¶ 3.

[30] Ex. H at 4 (Jan. 5, 2021 Adam Crum Dep. Tr. at 47:22–23).

[31] Ex. C at 8 (Carmichael Dep. 44:3–5).

[32] Ex. H at 4 (Crum Dep. 49:17–22); *see also* Ex. I.

[33] Ex. H at 5 (Crum Dep. 56:15–16).

[34] Ex. J at 3 (Jan. 5 Albert Wall Dep. Tr. ("Wall Dep.") 42:11–43:24).

[35] Dr. Blanford returned to work at API when a private contractor took over provision of some services. Ex. J at 3 (Wall Dep. 44:17–45:1).

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)                    Page 7 of 23

Case 3:19-cv-00036-JWS   Document 55   Filed 04/09/21   Page 7 of 23

## III. <u>ARGUMENT</u>

Federal Civil Rule 56 makes summary judgment proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). Faced with a motion for summary judgment, the party with the burden of proof must "make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* In doing so, the nonmovant is entitled to have the facts viewed in the most favorable light. *Hobler v. Brueher*, 325 F.3d 1145, 1148 (9th Cir. 2003). But when the law does not support the nonmovant, *id.*, or when there is no genuine dispute of fact, Fed. R. Civ. P. 56(a), summary judgment is appropriate.

**A.   Dr. Blanford and Dr. Bellville's Discharge Violated No Federal or State Free Speech Right.**

"When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Accordingly, to prevail on a claim he or she suffered retaliation for exercising free speech, "an employee must prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination." *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Wickwire v. State*, 725 P.2d 695, 700 (Alaska 1986). Drs. Blanford and Bellville allege that (1) Dr. Blanford was discharged for what he said and (2) that both doctors were discharged for refusing to resign. Neither allegation can be proved because each is legally flawed.

### 1.   Dr. Blanford's Claim he Suffered Retaliation for his Letter Fails.

Dr. Blanford's claim that he suffered retaliation because of what he wrote fails for two independent reasons: (a) his letter to the editor was not constitutionally protected because he was a policymaking employee; and (b) the State did not discharge him for writing the letter but, rather, for failing to offer his resignation.

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)                                    Page 8 of 23

Case 3:19-cv-00036-JWS   Document 55   Filed 04/09/21   Page 8 of 23

### a.  A Highly Placed State Employee Like Dr. Blanford May be Discharged Without Offending the First Amendment.

Courts generally apply the balancing test set forth in *Pickering v. Board of Education*, 391 U.S. 563 (1968), to determine "whether the state's legitimate administrative interests outweigh the employee's First Amendment rights." *Eng v. Cooley*, 552 F.3d 1062, 1071 (9th Cir. 2009). But there is "an exception to this general rule." *Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997). "Under *Elrod v. Burns*, 427 U.S. 347 (1976), a public official who is a 'policymaker' may be fired for political reasons without offending the United States Constitution." *Id.* Accordingly, "an employee's status as a policymaking . . . employee . . . dispos[es] of any First Amendment retaliation claim." *Biggs v. Best, Best & Krieger*, 189 F.3d 989, 994–95 (9th Cir. 1999). If Dr. Blanford was a policymaking employee, he had no constitutional right to retain his position after writing a letter to the editor or engaging in or refusing any other speech.

Dr. Blanford was a policymaker. Under *Branti v. Finkel*, 445 U.S. 507 (1980), "policymaker . . . does not mean 'one who makes policy.' Rather, the term refers to a position in which political considerations are 'appropriate requirement[s] for the effective performance of the public office involved.'" *Fazio*, 125 F.3d at 1333 (quoting *Branti*, 445 U.S. at 519). This determination is made with reference to "vague or broad responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders." *Fazio*, 125 F.3d at 1334 n.5. These factors inform "the question . . . whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Hunt v. County of Orange*, 672 F.3d 606, 611–12 (9th Cir. 2012).

Dr. Blanford was paid $298,000, roughly $25,000 more than he had been paid as a staff psychiatrist on account of his leadership role.[36] Statewide, only two other executive

---

[36] *Compare* Ex. D, *with* Ex. K.

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)                    Page 9 of 23

Case 3:19-cv-00036-JWS   Document 55   Filed 04/09/21   Page 9 of 23

branch employees made more.[37] Dr. Blanford clearly had technical competence as a doctor and was a skilled administrator.[38] And he supervised a large number of skilled staff, including 140 nurses, in addition to doctors and social workers.[39] The "power to control others" factor weighs in favor of Dr. Blanford's status as a policymaking employee. *See Bardzik v. County of Orange*, 635 F.3d 1138, 1148 (9th Cir. 2011).

The "most critical factor" is "influence over programs." *Id.* at 1146. This too shows that Dr. Blanford was a policymaker. He engaged in a give-and-take with API's CEO to shape the hospital's policy.[40] In doing so, he handled politically sensitive issues.[41] These were "very complicated" and "not very transactional."[42] And the policies that Dr. Blanford proposed were conveyed by the CEO to the appointed Commissioner.[43] Indeed, Dr. Bellville recognized the role that Dr. Blanford filled, arguing, with the co-writers of his letter, that Dr. Blanford was "the only staff member who ha[d] administrative experience" and was "best suited to remain at the helm of API in the future."[44]

### b. No Statement by Dr. Blanford Caused His Termination.

Even if Dr. Blanford could avoid his policymaker status, he must also show that the State terminated him because of his letter to the newspaper. It did not. The State discharged Dr. Blanford (like Dr. Bellville) because he failed to resign as requested.[45] The State discharged other employees who failed to resign.[46] There was no reason to treat

---

[37] Sheehan Decl. ¶ 2.

[38] Ex. C at 13 (Carmichael Dep. 89:25); Ex. F at 2.

[39] Ex. C at 5 (Carmichael Dep. 20:25–21:5).

[40] Ex. C at 12 (Carmichael Dep. 66:8–10).

[41] Ex. C at 9 (Carmichael Dep. 51:24–53:22).

[42] Ex. C at 12 (Carmichael Dep. 66:24–25).

[43] Ex. C at 7 (Carmichael Dep. 34:22–35:9).

[44] Ex. F at 2.

[45] Babcock Decl. ¶ 3.

[46] *Id.*

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)          Page 10 of 23

Case 3:19-cv-00036-JWS   Document 55   Filed 04/09/21   Page 10 of 23

Dr. Blanford differently. His letter to the editor failed to make an impression on his supervisor—the State's incoming Commissioner did not even remember its contents.[47] Commissioner Crum remembered only that Dr. Blanford and Dr. Bellville were "[t]wo employees who didn't want to work [at API]."[48]

Dr. Bellville's letter in support of Dr. Blanford only confirms this point. The letter had two other signatories—Dr. Deborah Guris and Dr. Lee Ann Gee. Neither were discharged. Just as Dr. Guris and Dr. Gee were not discharged for lending support to Dr. Blanford's views, Dr. Blanford was not discharged for those views. He was discharged because he failed to offer his resignation.

## 2.    Refusing to Resign is Not Constitutionally Protected.

The State did not terminate Dr. Blanford for what he said (or Dr. Bellville for supporting his statements). It terminated both doctors because they failed to offer resignations. Refusing to resign is not a constitutionally protected activity. True, freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). But public employees rarely, if ever, have the right to refuse job-related speech.

It is easy to see why—public employees accept pay to perform job duties, which often entail speaking for the government. The "First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." *Garcetti*, 547 U.S. at 424. This is no less true in the context of compelled speech. *See Bowie v. Maddox*, 653 F.3d 45, 47–48 (D.C. Cir. 2011) (applying *Garcetti* to an employee's refusal to sign an affidavit he disagreed with). An employee may have reason to disagree with a job-related order, but this "does not necessarily mean the employee has a cause of action under the First Amendment when he contravenes that

[47] Ex. H at 3 (Crum Dep. 44:15–21).

[48] Ex. H at 3 (Crum Dep. 44:25–45:1).

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)                    Page 11 of 23

Case 3:19-cv-00036-JWS    Document 55    Filed 04/09/21    Page 11 of 23

order." *Id.* at 48. Dr. Blanford and Dr. Bellville's public-employee compelled speech claims are non-starters.

Even if a public employee *could* raise a compelled speech claim, neither Dr. Blanford nor Dr. Bellville have one here. The State offended no constitutional principle by requiring them to submit resignations and state an interest in continued employment. This is because (a) the State requested no public statement from Dr. Blanford or Dr. Bellville; (b) the State was entitled to ask Dr. Blanford and Dr. Bellville to take an action, even one requiring words; and (c) insofar as the State requested a statement at all, it requested that Dr. Blanford and Dr. Bellville express interest in serving Alaskans, something they *wished* to express.

### a. The State Requested No Public Statement from Dr. Blanford or Dr. Bellville and Did Not Compel Any Speech.

The compelled speech doctrine protects people against required "dissemination of an ideological message . . . in a manner and for the express purpose that it be observed and read by the public." *Wooley*, 430 U.S. at 713. The archetypical compelled speech is a statement on a license plate that a driver must display "as part of his daily life indeed constantly while his automobile is in public view to be an instrument for fostering public adherence to an ideological point of view." *Id.* at 715. Compelled speech may also arise when the government requires a company to include statements with which it disagrees along with its bills. *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 15 (1986). This is unconstitutional, again, because it is public. *See id.* at 11. Compelled speech arises when the speaker is "closely linked with the expression in a way that makes [him] appear to endorse the government message." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 565 n.8 (2005) (citation omitted).

When the public would not reasonably attribute a government message to the speaker, there can be no compelled speech. *New Doe Child #1 v. Cong. of the U.S.*, 891 F.3d 578, 593–94 (6th Cir. 2018) ("Plaintiffs' Complaint does not allege that anyone has ever attributed the Motto to them."); *Jacobs v. Clark City Sch. Dist.* 526 F.3d 419, 438 (9th Cir. 2008) ("[T]he likelihood that a person viewing Dresser wearing his mandated school

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)                    Page 12 of 23

Case 3:19-cv-00036-JWS   Document 55   Filed 04/09/21   Page 12 of 23

uniform would have understood Dresser to be conveying a message of conformity is extremely small."). Accordingly, while the state may not mandate an objectionable license plate message, it may require currency to carry the words "In God We Trust" because "[c]urrency is generally carried in a purse or pocket and need not be displayed to the public" and "[t]he bearer of currency is thus not required to publicly advertise the national motto." *Wooley*, 430 U.S. at 717 n.15. This principle extends to state seals and official stamps, which may also carry symbols or mottos objectionable to some. *Id.* at 715 n.11. "The purpose of such seal[s] . . . is not to advertise the message [they] bear[] but simply to authenticate the documents by showing the authority of its origin." *Id.*

Here, too, the requested speech was private, not public. Mr. Babcock's memo requesting resignations asked for no public statement but only that employees privately submit letters to an email address. Indeed, State employees submitted a range of statements with their resignations, and the State publicized none of these.[49] Had either doctor submitted a resignation, they would have appeared to their neighbors and coworkers just as any other state employee. Similarly, having refused to submit a resignation letter by November 30, 2018, all they had to do to reclaim their jobs was say on December 5, 2018, that they "wanted to take their jobs back."[50] This was no public endorsement of an ideological message. It was a private conversation with a supervisor, who said, "Just let me know and we'll call that your reapplication."[51]

Even if a public employee could transform a required job action into a compelled speech claim, Dr. Blanford and Dr. Bellville cannot. The only thing asked of them, first in writing, and then in a private conversation, was a private commitment to wanting to do their jobs. This was after, and notwithstanding, both men's criticism of the resignation request. And it was a far cry from a public affirmation of an ideological message.

---

[49] Babcock Decl. ¶ 3.

[50] Ex. H at 5 (Crum Dep. 56:15–16).

[51] Ex. H at 5 (Crum Dep. 56:21–22).

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)                    Page 13 of 23

Case 3:19-cv-00036-JWS    Document 55    Filed 04/09/21    Page 13 of 23

### b. Resignation Is a Verbal Act, Not an Expressive Statement.

The first paragraph of the form letter the State suggested to employees read, "Please accept this letter as notice of my resignation from my position . . . . I understand my resignation shall be effective upon receiving notice from your administration." "[T]he right against compelled speech is not, and cannot be, restricted to ideological messages." *Frudden v. Pilling*, 742 F.3d 1199, 1206 (9th Cir. 2014) (quotations omitted). But it hinges on compelled communication of some "message." *Jacobs*, 526 F.3d at 438.

Nobody asked Dr. Blanford or Dr. Bellville for an expressive statement implicating freedom of speech. They were asked to take a verbal action potentially dissolving a contractual relationship. The form resignation letter suggested to them lacked any "connection to the marketplace of ideas and opinions, whether political, scientific, aesthetic, or even commercial." *King v. Fed. Bureau of Prisons*, 415 F.3d 634, 637 (7th Cir. 2005). In this way, it was like an order to sell stock, *id*., or words spoken to solicit a client, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 457 (1978). The paragraph constituted action unprotected even though it is "in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id*. at 456.

The second paragraph of the State's suggested form response letter read, "I have submitted my name for consideration for my current position to continue with the new administration." This, again, is not an expressive statement. It is another verbal action indicating a willingness to enter a contract. For the purposes of freedom of expression, it is indistinguishable from words of resignation.

### c. Dr. Blanford and Dr. Bellville Agreed with the Requested Statement of Desire to Continue in their Positions.

Even if the resignation letter the State suggested had expressive content, it did not convey a message that either Dr. Blanford or Dr. Bellville disagreed with. "[T]o state a proper compelled-speech claim, a plaintiff must object to a message conveyed by the speech he is required to utter." *Cressman v. Thompson*, 798 F.3d 938, 961 (10th Cir. 2015). The requested letter conveyed—if any message—a desire to continue work for the State under the new administration.

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)                               Page 14 of 23

Case 3:19-cv-00036-JWS   Document 55   Filed 04/09/21   Page 14 of 23

Dr. Blanford agreed with this desire. His letter to the editor stated, "I would like to continue as Director of Psychiatry because I believe there are feasible and fiscally responsible ways [to] improve API and our state mental health system."[52] Dr. Bellville also agreed. His letter to the administration concluded, "It is an honor to serve the people of Alaska and the patients who require care at API."[53]

Dr. Blanford and Dr. Bellville may argue otherwise—that the requested letter, or the simpler request for an oral affirmation of interest in retaining their positions, signified more. But the resignation request cannot mean whatever the doctors say it means. The Court should consider the resignation request from the perspective of a reasonable observer "cognizant of the 'then-current domestic and foreign affairs of [the] government,' 'issue[s] of intense public concern,' the 'environment' in which an expressive act occurs, and the reasons for the speaker's expression." *Cressman*, 798 F.3d at 958 (quoting *Spence v. Washington*, 418 U.S. 405, 410 (1974)). Dr. Blanford and Dr. Bellville "put[] forth no evidence to suggest that, even though [nearly] *every* [state employee] was required [to submit a resignation request], a person observing these . . . [employees] would understand any of them to be expressing a personal affinity for conformity" or for the politics of the new administration. *Jacobs*, 526 F.3d at 438 (emphasis in original); *see also Troster v. Penn. State Dep't of Corrs.*, 65 F.3d 1086, 1092 (3d Cir. 1995) ("Troster . . . presented the district court with no evidence . . . suggesting that anyone (other than himself) would be likely to view the wearing of the patch as communicative or expressive . . . .").

The *Anchorage Daily News* reported Governor Dunleavy as saying, "We want to give people an opportunity to think about whether they want to remain in this administration and be able to have a conversation with us."[54] This statement did not solicit an indication of support for any policy or ideology. It merely indicated that employees

---

[52] Ex. G.

[53] Ex. F at 3.

[54] Ex. B at 2.

should be willing "to have a conversation" with the State's political leaders. That is not inconsistent with Dr. Blanford's statement that he would like to continue as medical director at API if funding were assured. And it is not inconsistent with Dr. Bellville's statement congratulating the Governor on his election and invoking the honor of serving the people of Alaska.

## B. The Result is the Same Under the Alaska Constitution.

The Court must "apply the law as [it] believe[s] the [Alaska] Supreme Court would apply it" to Dr. Blanford and Dr. Bellville's state constitutional claims. *Astaire v. Best Film & Video Corp.*, 116 F.3d 1297, 1300 (9th Cir. 1997). The Alaska Supreme Court would apply the state constitution to reach the same result this Court reaches on Dr. Blanford and Dr. Bellville's First Amendment claims. While the Alaska free speech right is broader than the federal right in some respects, *Alaskans for a Common Language v. Kritz*, 170 P.3d 183, 203 (Alaska 2007), the few Alaska cases concerning public employee speech rely on federal cases, *see id.*; *Wickwire*, 725 P.2d at 700; *State v. Haley*, 687 P.2d 305, 312 (Alaska 1984); *City & Borough of Sitka v. Swanner*, 649 P.2d 940, 943–45 (Alaska 1982). First, Dr. Blanford's claim to recover for his letter fails because he is a policymaking employee under Alaska law for the same reasons he is under federal law—he used his leadership skills and vague job duties to shape policy in Alaska's provision of mental health services. Second, Dr. Blanford and Dr. Bellville's compelled speech claims fail because the State requested no public statement, resignation is not expressive, and they agreed with the requested private statement – they wanted to serve the people of Alaska.

### 1. Policymaker Status Precludes Dr. Blanford's Free Speech Claim.

Alaska follows *Branti* in determining policymaking employee status. *City & Borough of Sitka*, 649 P.2d at 945. Accordingly, because Dr. Blanford's duties were vague and broad and because he had a role in shaping policy on politically sensitive matters, Dr. Blanford is a policymaking employee under Alaska law, just as he is under federal law.

The result should be dismissal of Dr. Blanford's free speech claims. In the decades after *Branti*, courts across the country have readily disposed of the free speech claims of

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)                    Page 16 of 23

Case 3:19-cv-00036-JWS   Document 55   Filed 04/09/21   Page 16 of 23

policymaking employees. The First, Sixth, Seventh, and Tenth Circuits apply the *Branti* policymaker exception to dismiss speech claims "relate[d] to either [the employee's] political affiliation or substantive policy views." *Rose v. Stephens*, 291 F.3d 917, 921–22 (6th Cir. 2002) (summarizing cases). In this approach, "the *Pickering* balance favors the government as a matter of law." *Id.* at 922. The Ninth Circuit also considers policymaking status dispositive of free speech claims. *See, e.g.*, *Bardzik*, 635 F.3d at 1151. Today, the Alaska Supreme Court would follow federal cases on Dr. Blanford's policymaker status to dismiss his claim. True, the Alaska Supreme Court, nearly 40 years ago, stated in dictum that policymaking status is merely one factor in the *Pickering* analysis. *See City & Borough of Sitka*, 649 P.2d at 945. But the case concerned an employee held not to be a policymaker, *id.*, and the Court should not regard this statement as considered dicta, *see Rocky Mountain Fire & Cas. Co. v. Dairyland Ins. Co.*, 452 F.2d 603, 603–04 (9th Cir. 1971); *see also McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 662 (3d Cir. 1980) ("[A] federal court should be circumspect in surrendering its own judgment concerning what the state law is on account of dicta.").

## 2.    Dr. Blanford and Dr. Bellville's Compelled Speech Claims Fail Under Alaska Law.

No Alaska case addresses a compelled speech claim. But there is no reason Alaska law should reach more broadly than federal law in this arena. As under federal law, a compelled speech claim cannot square with public employment. Refusing to speak does nothing to serve the principle that "it makes sense to encourage employee speech about the operations of government since employees often are in the best position to offer informed opinions." *Wickwire*, 725 P.2d at 703; *see also Alaskans for a Common Language*, 170 P.3d at 203–04. Dr. Blanford and Dr. Bellville conveyed no information by refusing to resign. Even if a public employee could state a claim for compelled speech under Alaska law, Dr. Blanford and Dr. Bellville cannot do so here. As with their federal claim, their state-law claim suffers the defects that the State required no public statement, resignation was not an expressive act, and both doctors agreed with the requested statement that they wished to continue serving the people of Alaska.

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)                    Page 17 of 23

Case 3:19-cv-00036-JWS    Document 55    Filed 04/09/21    Page 17 of 23

**C.    Dr. Blanford and Dr. Bellville's Section 1983 Claims Fail Without a Constitutional Violation.**

Dr. Blanford and Dr. Bellville's section 1983 claim fails for two reasons: (1) there was no constitutional violation, and (2) Governor Dunleavy and Mr. Babcock are entitled to qualified immunity.

**1.    There Was No Constitutional Violation.**

Dr. Blanford and Dr. Bellville's section 1983 claims against Governor Dunleavy and Mr. Babcock fail because their discharge violated no constitutional right. *See Graham v. Connor*, 490 U.S. 386, 393–94 (1989) ("[Section] 1983 is not itself a source of substantive rights but merely provides a method for vindicating federal rights elsewhere conferred." (quotation omitted)). And, Dr. Blanford and Dr. Bellville have no section 1983 claim against the State and would be barred by the Eleventh Amendment even if they did. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *Quern v. Jordan*, 440 U.S. 332, 339, 345 (1979).[55] Accordingly, claims for an injunction and damages should be dismissed.

**2.    Governor Dunleavy and Mr. Babcock Are Entitled to Qualified Immunity.**

The section 1983 claim comes up short for the additional reason that Governor Dunleavy and Mr. Babcock "are sheltered from suit, under [the] doctrine . . . [of] qualified immunity" because "their conduct [did] not violate clearly established . . . constitutional rights." *Wood v. Moss*, 572 U.S. 744, 748 (2014) (quotations omitted). Even if Dr. Blanford and Dr. Bellville "make out a violation of a constitutional right," they bear the burden to establish "the right at issue was 'clearly established' at the time of [the] alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see also Kramer v. Cullinan*,

---

[55] Nor do Dr. Blanford and Dr. Bellville have a claim for damages against Governor Dunleavy in his official capacity. *See Will*, 491 U.S. at 71, n.10. They have no claim under section 1983 for backpay, because the Eleventh Amendment permits only "decrees which by their terms [are] prospective in nature." *Edelman v. Jordan*, 415 U.S. 651, 668 (1974).

878 F.3d 1156, 1162, 1165 (9th Cir. 2018); *Moran v. Washington*, 147 F.3d 839, 844 (9th Cir. 1998).

To carry their burden, Dr. Blanford and Dr. Bellville must point to "cases of controlling authority in" the Ninth Circuit or "a consensus of cases of persuasive authority" alerting Governor Dunleavy and Mr. Babcock to clearly established law at the time of the discharge. *Kramer*, 878 F.3d at 1163 (quotations omitted). In doing so, they must identify cases that "placed the . . . constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quotations omitted). This requires showing that "the violative nature of *particular* conduct is clearly established." *Id.* (quotations omitted). General rules of law do not give adequate warning to officials in contexts where it is difficult to determine how a relevant legal doctrine will apply to facts. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018). The contours of the right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* at 1153 (quotations omitted) This requires a prior case with "similar circumstances." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam).

Rights are rarely clearly established when they concern "a unique set of facts and circumstances." *Id.* For this reason, public employee free speech rights are "rarely, if ever, sufficiently clearly established to preclude qualified immunity" because their determination turns on "a fact-sensitive, context-specific balancing of competing interests." *Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*, 149 F.3d 971, 980 (9th Cir. 1998); *see also Moran*, 147 F.3d at 845. Two features of this case preclude any finding that the rights at issue were clearly established.

First, it could not be clearly established that Dr. Blanford was anything other than a policymaking employee. "[P]olicymaker analysis is unsettled and difficult for many employment positions." *Bardzik*, 635 F.3d at 1152 (holding that positions associated with jails and courtroom security are not policymaker positions). Where some factors point toward policymaker status, a public employee does not act unreasonably in treating the employee as a policymaker. *See Hunt*, 672 F.3d at 615–16 (pointing to the plaintiff's

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)                    Page 19 of 23

Case 3:19-cv-00036-JWS   Document 55   Filed 04/09/21   Page 19 of 23

discretion over implementation of policy and influence in formulation of policy). Even if Dr. Blanford's status as one of the State's best-paid employees, control over a staff of more than 100, influence on policy related to politically sensitive matters, and broad and vague duties were to fall short of policymaker status—and they do not—these features of his position preclude a finding that it would have been unreasonable for Governor Dunleavy and Mr. Babcock to think otherwise. They are entitled to qualified immunity.

Second, there are vanishingly few public employee compelled speech cases—and apparently no opinions from the Supreme Court or the Ninth Circuit. This, alone, precludes the clear establishment of any right. Clearly established law is doubly lacking in the circumstances of this case. Even if public employees could state a compelled speech claim related to their employment, here, any requested statement was a private, verbal action, rather than expression, and to the extent any statement was requested, it concerned interest in serving the people of Alaska, something that both Dr. Blanford and Dr. Bellville expressed *agreement* with days earlier. If anything Governor Dunleavy and Mr. Babcock did violated the Constitution—and it did not—existing case law gave them no "fair notice." *See Kisela*, 138 S. Ct. at 1152. They are entitled to qualified immunity.

## D. Dr. Blanford and Bellville's State Law Claims Fail Without a Constitutional Violation.

### 1. Alaska's Constitution Does not Supply a Cause of Action in this Case.

The Court should dismiss the standalone claim for violation of the Alaska free speech right because Alaska law does not "imply a private cause of action for damages under the Alaska Constitution except in cases of flagrant constitutional violations where little or no alternative remedies are available." *Larson v. State, Dep't of Corr.*, 284 P.3d 1, 10 (Alaska 2012) (quotation omitted). This case presents no constitutional violation— much less a flagrant one—and even if it did, other state and federal causes of action would mark alternative paths to seek a remedy.

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)                    Page 20 of 23

Case 3:19-cv-00036-JWS   Document 55   Filed 04/09/21   Page 20 of 23

## 2. The Implied Covenant of Good Faith and Fair Dealing is Not Breached in this Case Without a Constitutional Violation.

As at-will employees, Dr. Blanford and Dr. Bellville could "be fired for any reason that d[id] not violate the implied covenant of good faith and fair dealing." *McAnally v. Thompson*, 397 P.3d 322, 324 n.1 (Alaska 2017) (quotations omitted). "The covenant has two components, a subjective component and an objective component." *Crowley v. State, Dep't of Health & Soc. Servs.*, 253 P.3d 1226, 1230 (Alaska 2011). Dr. Blanford and Dr. Bellville hitch their claims under both components to termination "on unconstitutional grounds or for reasons that violate public policy."[56] But there was no such violation, and the cause of action for breach of the implied covenant of good faith and fair dealing should be dismissed on summary judgment.

### a. There Was No Violation of the Subjective Component of the Implied Covenant of Good Faith and Fair Dealing.

There was no violation of the subjective component of the implied covenant of good faith and fair dealing, which "focuses on the employer's motives." *Crowley*, 253 P.3d at 1230. An employer violates this component of the covenant in terminating an employee to deprive the employee of benefits, such as bonus pay or retirement benefits, or because of animus by the person making the termination decision. *See Lentine v. State*, 282 P.3d 369, 376 (Alaska 2012); *Ramsey v. City of Sand Point*, 936 P.2d 126, 133 (1997). There is no evidence of subjective bad faith here. Nor could there be. The State tried to persuade Dr. Blanford and Dr. Bellville to keep their positions.

### b. There Was No Violation of the Objective Component of the Implied Covenant of Good Faith and Fair Dealing.

There was no violation of the objective component of the implied covenant of good faith and fair dealing, which "prohibits the employer from dealing with the employee in a manner that a reasonable person would regard as unfair." *Crowley*, 253 P.3d at 1232 (quotation omitted). Dr. Blanford and Dr. Bellville claim their discharges violated the

---

[56] Doc. 7-2 at 16 (Compl. ¶ 73).

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)                    Page 21 of 23

Case 3:19-cv-00036-JWS   Document 55   Filed 04/09/21   Page 21 of 23

Alaska Constitution, AS 44.17.030, and Alaska's merit principle. As explained above, both discharges comported with the constitution. Similarly, neither discharge was barred by statute or the merit principle.

"[T]he key concern of [AS 44.17.030] is that department heads, in delegating functions and appointing staff, maintain appropriate supervision, direction, and control over their subordinates." *Hertz v. State*, 22 P.3d 895, 904 (Alaska App. 2001) (quotation omitted). The statute is not violated when an agency hires a private contractor. *See id.* Nor is the statute violated when an independent prosecutor is appointed. *State v. Breeze*, 873 P.2d 627, 633 (Alaska 1994). If the statute permits attenuation of politically accountable persons' control of staff, it cannot be that increased control by politically accountable persons violates the statute. Nothing in the statute bars the Governor or his chief of staff from discharging state employees. In any event, newly-appointed Commissioner Crum met with both Dr. Blanford and Dr. Bellville the day after their discharge and set the parameters for their continued employment—they just needed to express the desire to stay.

The Alaska Constitution requires the legislature to "establish a system under which the merit principle will govern the employment of persons by the State." Alaska Const. art. XII, § 6. "In actual practice, however, the merit principle is more complex and ambiguous than the above definition reveals." *Alaska Pub. Emps. Ass'n v. State*, 831 P.2d 1245, 1249 (Alaska 1992) (quotations omitted). "The Alaska legislature adopted the State Personnel Act (AS 39.25.010–.220) for the express purpose of defining and implementing the merit principle." *Moore v. State, Dep't of Transp. & Pub. Facilities*, 875 P.2d 765, 768 (Alaska 1994). Both Dr. Blanford and Dr. Bellville fall outside the Personnel Act's coverage. *See* AS 39.25.110(13) (exempting from the Act "physicians licensed to practice in this state and employed by the Department of Health and Social Services"). For this reason alone, Dr. Blanford and Dr. Bellville may not premise a breach of the implied covenant of good faith claim on the merit principle.

Even if the merit principle were available to Dr. Blanford and Dr. Bellville, which it is not, the State did not violate it. Classified employees, whose protections are strongest

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)                    Page 22 of 23

Case 3:19-cv-00036-JWS    Document 55    Filed 04/09/21    Page 22 of 23

under the Personnel Act, are shielded only from "unlawful discrimination due to political beliefs." AS 39.25.160(g). This case is not about political beliefs. The State's actions accorded with the federal and Alaska constitutions and were therefore lawful. This claim should be dismissed.

## IV. <u>CONCLUSION</u>

Dr. Blanford and Dr. Bellville saw more than was present in the resignation request that attended a transition of gubernatorial administrations. They failed to do what most of their colleagues did. And when the State tried to clear things up a few days after their discharge, Dr. Blanford and Dr. Bellville declined even to say that they wanted to continue in their positions. The State and some of its most vulnerable citizens lost two good doctors in exchange for a lawsuit that has now been pending for more than two years. Now this suit should be dismissed.

DATED: April 9, 2021

LANE POWELL LLC
Attorneys for Defendants


By:    s/Michael B. Baylous
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Brewster H. Jamieson, ABA No. 8411122
Michael B. Baylous, ABA No. 0905022

I certify that on April 9, 2021, a copy of
the foregoing was served electronically on:

Stephen Koteff, skoteff@acluak.org
Joshua Decker, jdecker@acluak.org

s/Michael B. Baylous
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

Defendants' Motion for Summary Judgment
*Blanford, et al. v. Dunleavy, et al.* (Case No. 3:19-cv-00036-JWS)          Page 23 of 23

Case 3:19-cv-00036-JWS   Document 55   Filed 04/09/21   Page 23 of 23