STEPHEN KOTEFF, NO. 9407070
JOSHUA A. DECKER, NO. 1201001
ACLU OF ALASKA FOUNDATION
1057 W. FIREWEED LANE, STE. 207
ANCHORAGE, AK 99503
(907) 263-2007
*skoteff@acluak.org*

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

ANTHONY L. BLANFORD and JOHN K. BELLVILLE,

Plaintiffs,

v.

MICHAEL J. DUNLEAVY, in his individual and official capacities; TUCKERMAN BABCOCK; and the STATE OF ALASKA,

Defendants.

Case No. 3:19-cv-00036-JWS

**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Anthony L. Blanford and John K. Bellville oppose Defendants' Motion for Summary Judgment. None of the arguments advanced in Defendants' Motion are supported by the applicable law, and many ask the Court to ignore some of the basic, undisputed facts surrounding Defendants' resignation demand and subsequent termination of Plaintiffs' employment. For these reasons, explained more fully below, Defendants' Motion should be denied.

**ACLU of Alaska Foundation**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
Tel: 907.258.0044
Fax: 907.258.0288
Email: *legal@acluak.org*

## INTRODUCTION

Defendants advance several primary arguments in support of their Motion. Defendants first assert that Dr. Blanford was a policymaker and not entitled to First Amendment protection. But the facts demonstrably establish that political considerations were not relevant to Dr. Blanford's effective job performance, and the specific factors on which Defendants rely do not suggest differently.

Next, Defendants argue that their resignation demand did nothing more than compel Plaintiffs to convey a job-related communication that lacked First Amendment protection. This argument, however, ignores the content and context of the resignation demand that placed Plaintiffs' refusal squarely within the realm of protected political speech. Even so, Defendants, argue, the demand required no public message: it compelled only a private communication lacking any expressive statement. But this is contrary to established law, and in this case, Plaintiffs' right not to speak or align themselves with the governor-elect's agenda did not hinge on publicly broadcasting their refusal. What's more, Defendants' own characterization of the resignation demand made it obvious that compliance would mean agreement with a partisan message.

Individual Defendants Dunleavy and Babcock next assert that they are entitled to qualified immunity even if they did violate Plaintiffs' First Amendment rights. But those rights were clearly established when Defendants terminated Plaintiffs' employment, and no reasonable government official could have believed that the terminations were a constitutional exercise of their authority. Defendants were on "fair notice" that their actions were illegal and are not immune.

Finally, Defendants argue that Plaintiffs' good faith and fair dealing claims should be dismissed because neither the objective nor subjective components of the covenant were breached. Defendants assert that, since there was no constitutional violation, these state law claims cannot stand. But the deprivation of Plaintiffs' First Amendment rights is clear. And, as importantly, Plaintiffs' cause of action for violation of the covenant of good faith and fair dealing does not rest on their constitutional claims alone.

## ARGUMENT

### A. Doctor Blanford Was Not a policymaker

Defendants assert that Dr. Blanford was a policymaker and therefore without First Amendment protections on which to base his

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

claims. But Defendants fail entirely to carry their burden to show that "political considerations" were even remotely important to Dr. Blanford's effective job performance. Furthermore, Defendants' arguments misrepresent the facts relevant to Dr. Blanford's job duties to overinflate his actual role at the Alaska Psychiatric Institute ("API"). Quite contrary to Defendants' assertions, the undisputed facts demonstrate conclusively that Dr. Blanford was *not* in a policymaking position.

As described at pages 32–34 of Plaintiff's Motion for Summary Judgment (Pl. Mtn.), the "essential inquiry in determining" whether an employee is a policymaker for First Amendment purposes "'is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.'" *Hunt v. Cty. of Orange*, 672 F.3d 606, 611–12 (9th Cir. 2012) (quoting *Branti v. Finkel*, 445 U.S. 507, 518 (1980)). "Party affiliation" is synonymous with "'political affiliation,' which 'includes commonality of political purpose and support.'" *Walker v. City of Lakewood*, 272 F.3d 1114, 1132 (9th Cir. 2001) (quoting *Biggs v. Best, Best & Krieger*, 189 F.3d 989, 996 (9th Cir. 1999)). But because the policymaker exemption is a "narrow exception" to public employees'

First Amendment protections, *DiRuzza v. Cty. of Tehama*, 206 F.3d 1304, 1308 (9th Cir. 2000), it "should be applied with caution." *Hunt,* 672 F.3d at 611.

"Determining the particular duties" an employee is tasked to effectively perform is a question of fact. *Walker*, 272 F.3d at 1132. On the other hand, whether those duties make that person a policymaker "is a question of law." *Id.* In all cases, the burden of establishing that a discharged employee was a policymaker rests with the government. *Id.* Defendants must demonstrate that the "actual, not the possible, duties of an individual employee" establish that "political loyalty is appropriate for the effective performance of her job." *DiRuzza*, 206 F.3d at 1310.

In *Fazio v. City & Cty. of San Francisco*, 125 F.3d 1328, 1334 n.5 (9th Cir. 1997), the Ninth Circuit recited nine factors to be taken into account when determining the policymaking nature of a position. These factors are "vague or broad responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders." *Id.* But the court has been critical of a mechanical application

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

of these factors, stressing that they should be considered "in light of the underlying purpose of the 'policymaker' exception." *Hunt*, 672 F.3d at 611. *Hunt*, the Ninth Circuit's definitive opinion on determining policymaker status, holds that where the record shows "political considerations were not appropriate requirements for the effective performance" of a job, the *Fazio* factors lose relevance and should not be used as a substitute for this "essential inquiry." *Id.* at 612. To do so would be "to lose sight of the forest for the trees." *Id.*

As demonstrated in Plaintiffs' Motion for Summary Judgment, political considerations were *not* appropriate requirements for Dr. Blanford's effective performance of his job. Nothing Dr. Blanford was required to do as the chief of psychiatry required a "commonality of political purpose and support" with or on behalf of Governor Dunleavy. *Walker*, 272 F.3d at1132. Gavin Carmichael, API's then-CEO and Dr. Blanford's supervisor, made it clear that whether Dr. Blanford supported Governor Dunleavy's agenda had no influence on any of his job responsibilities. Pl. Mtn., Exhibit 13 at 12 (Tr. 86:1-9). Nor did Dr. Blanford's political affiliation. *Id.* (Tr. 85:19-25). Nor was his "clinical judgment ever influenced by political considerations. Ex. 1 (Deposition of Gavin Carmichael (excerpted)) at 10 (Tr. 90:12-15).

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

Conversely, Defendants have not shown, or attempted to show, how political considerations were even remotely connected to Dr. Blanford's performance. Instead, contrary to what *Hunt* admonishes, Defendants seize on a few out of context "*Fazio"* factors to try to make their case. In doing so, Defendants mischaracterize the relevant testimony and draw factually incorrect conclusions from the evidence in the record.

Defendants first assert that Dr. Blanford was a policymaker because of his high salary. Def. Mtn at 9–10. Relative pay is a *Fazio* factor, "*tending* to signify a position of some influence." *Ecker v. Cohalan*, 542 F. Supp. 896, 902 (E.D.N.Y. 1982) (emphasis added). But in this case, Dr. Blanford's pay had nothing to do with his influence at all. Instead, it simply represented the high salary that a psychiatrist can command and the reality that API must compete with the market to employ a competent professional staff.

When Dr. Blanford was first hired as a staff psychiatrist, his salary was $273,000. Def. Mtn, Ex. K at 1. According to Defendants, this salary was "based on: Board certification in Adult Psychiatry, over 5 years of relevant experience, and familiarity with Alaska Psychiatric Institute as he has worked at the facility in the past as a locum tenens

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

provider." *Id.* And Dr. Bellville, whom Defendants do *not* claim was a policymaker, was hired with a similar salary of $262,500. Pl. Mtn., Exhibit 12 at 1. These salaries, in fact, represented a significant savings over the alternative practice of hiring locum tenens psychiatrists, a practice necessitated by the inability to fill permanent staff positions. *Id.* at 1, 2. Locum tenens psychiatrists cost API between $550,000 and $600,000 per year, per position. *Id.* Dr. Blanford's salary, then, had everything to do with managing the high cost of employing psychiatrists, and nothing to do with the level of influence he might have had.

Defendants next assert what may seem obvious: that Dr. Blanford satisfies the *Fazio* factor of "technical competence." Def. Mtn. at 10. But Defendants do not explain how such competence is relevant. Dr. Bellville, as a non-policymaker, is also presumed to have been technically competent, since his position was "essential to the diagnostic evaluation, treatment, medication management, and consultation for behavioral management on the 26 bed [API] psychiatric unit." Pl. Mtn., Ex. 12 at 1. Defendants' have therefore failed to show how Dr. Blanford's technical competence is relevant "in

light of the underlying purpose of the 'policymaker' exception." *Hunt*, 672 F.3d at 611.

Defendants also claim that Dr. Blanford's "power to control others" is a factor because "he supervised a large number of skilled staff, including 140 nurses . . . ." Def. Mtn, at 10. But this is not so. In fact, Dr. Blanford supervised only around fifteen people, while the nurses were supervised by a separate nursing director. Ex. 2 (Declaration of Anthony Blanford) at ¶¶ 2, 3. Nevertheless, "'merely being a supervisor/administrator . . . is not sufficient to show that political affiliation is an appropriate requirement for the job in question.'" *Hunt v. Cty. of Orange*, 672 F.3d at 614 (quoting *Milazzo v. O'Connell,* 108 F.3d 129, 133 n. 1 (7th Cir.1997)).

Defendants contend, however, that Dr. Blanford's authority was something more, saying "he negotiated with the nurses' union to implement 24-hour staffing, persuading the union to accept 12-hour shifts." Def. Mtn. at 5. But this too is false. At no time did Dr. Blanford "negotiate" with the nurses' union, on staffing matters or on anything else. Ex. 2, ¶ 4. Not only is this assertion untrue, it is not even supported by the testimony that Defendants cite. *See* Def. Mtn., Exhibit C at 11 (Tr. 64:16-23).

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

Dr. Blanford's authority as a supervisor was also limited. He had no independent ability to hire or promote. Ex. 2, ¶ 6. This was reserved to API's Governing Body. *Id.* In *Hunt*, the court found the "power to control others" factor to be unavailing because the plaintiff's authority did not allow him to hire or promote employees; instead, it was "limited and largely operational." 672 F.3d at 614. The same is true for Dr. Blanford. Dr. Blanford's power to control others was therefore too constrained to indicate policymaker status.

Finally, Defendants argue that Dr. Blanford's "influence over programs" made him a policymaker. But here, too, Defendants mischaracterize the evidence and overstate Dr. Blanford's actual role. Defendants assert, for example, that Dr. Blanford "handled politically sensitive issues," relying on testimony from Mr. Carmichael, the former CEO. Def. Mtn. at 10 and n.41. But the testimony Defendants cite refers to "decisions that [*Mr. Carmichael, as the CEO*] might make that would be influenced by political considerations." *See* Def. Mtn., Ex. C (Tr. 51:17-19). This says nothing about the much more limited role that Dr. Blanford, Mr. Carmichael's subordinate, would have played in developing or influencing policy.

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

In fact, Dr. Blanford lacked any authority to make policy on his own, and his contributions to formulating or developing policy were restricted. This was so because, as described by Mr. Carmichael, "at API you don't just arbitrarily dream up or craft policy in a vacuum. It takes a cast of many to get it approved. Ex. 1 at 7 (Tr. 82:1-12). "Many people feed their information into what's going to become the policy at API in terms of admissions and clinical . . . ." *Id.* at 6 (Tr. 33:6-8). "If you want to make a clinical policy, that obviously has to be cleared through the governing board, through the commissioners, et cetera." *Id.* at 5 (Tr. 32:19-23). For example, "if you have policies that are going to affect the intake of patients statewide, then that obviously is bounced above people outside the hospital" such as the commissioner, the deputy commissioner, and the Governing Body. *Id.* at 7 (Tr. 82:1-12).

This Governing Body serves as API's board of directors and "is responsible for broad policy making in accordance with applicable State of Alaska laws and regulations." Ex. 2, ¶ 10. Its authority is delegated to it by the Commissioner of Health and Social Services, and it is empowered to "determine and maintain the objectives, purposes, and values of the Hospital," to hire and fire the CEO, and to approve the budget, bylaws, rules, regulations, policies, and procedures of API. *Id.*

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

This Governing Body is made up of eleven voting members, but the chief of psychiatry is not one of them. *Id.* ¶ 11. If Dr. Blanford or another psychiatrist wanted to propose a clinical policy, "a member of the staff would be tasked with policy revision and would then bring the revised policy to a staff meeting, where it was sent back for more revisions, then voted upon." *Id.* ¶ 8. But these policies still required Governing Body approval. *Id.*

This bureaucratic hierarchy shows that Dr. Blanford was not in a position to have substantial influence over programs at API the way policymakers normally would. Those responsibilities were reserved to the CEO and Governing Body. While it is true that Dr. Blanford had a voice in formulating policy, so did many other members of the medical staff, just as one would expect in any well-run hospital.

In sum, the record firmly establishes that political considerations were not appropriate requirements for Dr. Blanford's effective performance of his job. The record also demonstrates that none of the *Fazio* factors, as applied to Dr. Blanford's position, would warrant a policymaker finding. Accordingly, Defendants' unsupported assertions that Dr. Blanford was a policymaker should be dismissed.

**ACLU of Alaska Foundation**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
Tel: 907.258.0044
Fax: 907.258.0288
Email: *legal@acluak.org*

**B. Plaintiffs Did Not Refuse to Perform Any Part of Their Official Responsibilities**

Defendants argue that Plaintiffs were required to submit their resignations as part of their "official responsibilities." Def. Mtn. at 11. As such, Defendants say, Plaintiffs' refusal to resign was job-related speech and not constitutionally protected. *Id.* at 11–12. Defendants' argument ignores the content and context of the resignation demand. No part of either doctor's "official responsibilities" would have required them to say that they wanted to work on a particular political agenda, regardless of whether that agenda belonged to the incoming governor or someone else.

Defendants cite *Garcetti v. Ceballos*, 547 U.S. 410 (2006), for the proposition that a public employee may be disciplined for contravening a job-related order. *Id.* But *Garcetti* requires "a 'practical' inquiry into an employee's 'daily professional activities' to discern whether the speech at issue occurred in the normal course of those ordinary duties." *Barone v. City of Springfield, Oregon*, 902 F.3d 1091, 1099 (9th Cir. 2018) (quoting *Garcetti,* 574 U.S. at 422, 424.) "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014).

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

The Ninth Circuit has articulated a number of "guiding principles" to be applied in determining whether an employee's speech is constitutionally protected under *Garcetti*. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074 (9th Cir. 2013). In particular, "the subject matter of the communication is . . . highly relevant to the ultimate determination . . . ." *Id.* at 1074–75. In this context, "routine reports" typically within an employee's job duties would generally not be protected. *Id.* at 1075. But in this case, the unprecedented demand for resignations from a vast number of employees at all levels of the state government was anything but routine. And the subject matter—the willingness to work on a partisan agenda—was far from anything rationally related to a psychiatrist's care of patients at API.

Also relevant to the inquiry is whether the employee's speech is "in direct contravention to his supervisor's orders . . . ." *Id.* If it is, "that speech may often fall outside of the speaker's professional duties." *Id.* Obviously, that is the case here. The only reason that Dr. Blanford and Dr. Bellville were fired was because they refused to comply with Defendants' directive to offer their resignations.

Contrary to Defendants' assertions, *Garcetti* does not create a free pass for government officials to retaliate against public employees

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

whenever they refuse to engage in "job-related" speech. In all cases, an appropriate, fact-specific inquiry must be made. And in this case, Plaintiffs' refusal to commit their allegiance to Governor Dunleavy's political agenda falls squarely outside the "normal course of [their] ordinary duties." *Barone*, 902 F.3d at 1099.

### C. Plaintiffs Were Not Required to Widely Publicize Their Refusals to Endorse a Political Agenda

Defendants argue that Plaintiffs' refusal to resign was not protected speech because it was not widely disseminated to the public. Defendants. Def. Mtn. at 13. They liken Plaintiffs' refusal to carrying currency in one's purse or pocket, or to using state seals or official stamps with objectionable symbols or mottos. *Id.* But no case has held that a public employee's speech—especially the refusal to endorse a particular message—must be broadcast to the world to earn First Amendment protection.

Indeed, Defendants' reasoning has been explicitly rejected by the United States Supreme Court. As the Court has made clear: "[t]he First Amendment forbids abridgment of the 'freedom of speech.' Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." *Givhan v.*

*W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415–16 (1979). The Court noted that, in its prior cases involving governmental employee free speech rights, "public expression by the employee was not critical to the decision." *Id.* at 415.

The same is true in the Court's decisions involving the right not to speak. For example, in *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943), the Supreme Court found that forced recitation of the Pledge of Allegiance "requires affirmation of a belief and an attitude of mind." *Id.* at 633. It was therefore unimportant to the Court whether a speaker of the Pledge was perceived by others as endorsing the message.

Likewise, in *Wooley v. Maynard*, 430 U.S. 705 (1977), the Court held that "the right of freedom of *thought* protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Id.* at 714 (emphasis added). The Court also held that the "First Amendment protects the right of individuals to . . . refuse to foster" ideas advanced by the state that "they find morally objectionable." *Id.* at 715. While the Court also recognized that one of the impacts of the compelled speech at issue was

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

public display of the objectionable message, its holding did not depend on that result.

And in in *Baird v. State Bar of Arizona*, 401 U.S. 1 (1971), where the Court struck down a state bar's attempts to compel an applicant "to state whether she had ever been a member of the Communist Party," the obviously limited dissemination of the sought-after statement was not at issue. *Id.* at 4-5. Furthermore, in the series of "loyalty oath" cases decided by the Court, it has been enough that the compelled speech at issue be directed only to the government hiring authority itself. *E.g., Cole v. Richardson*, 405 U.S. 676 (1972).

In the same vein, relying on their "suggested form response letter," Defendants argue that all Plaintiffs were directed to do was "to take a verbal action potentially dissolving a contractual relationship" in a way that did not implicate protected speech. Def. Motion at 14. But it is illusory to say that the resignation demanded of Plaintiffs lacked connection to political ideas or opinions, because that ignores the context in which the demand was issued. One must consider the "content, form, and context of a given statement, as revealed by the whole record," to evaluate whether it deserves First Amendment protection. *Connick v. Myers*, 461 U.S. 138, 147–48 (1983).

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

In this case, context is key. Defendants themselves described what the resignation would mean. According to Mr. Babcock, complying with the resignation demand meant saying "I want to work for the Dunleavy administration." Pl. Mtn., Ex. 4 at 2. It meant answering in the affirmative the question, "Do you want to work on this agenda, do you want to work in this administration?" *Id.* And, in case there was any doubt, refusing to comply would be interpreted to mean a withholding of support, the consequences for which were clear: "If you don't want to express a positive desire, just don't submit your letter of resignation . . .[a]nd then you've let us know you just wish to be terminated." *Id.*

The "whole record" demonstrates that the resignation demand was laden with political freight. Defendants cannot offload it now by focusing solely on a few words suggested by the offered resignation form. Their attempts to do so should be rejected.

### D. Defendants Dunleavy and Babcock are Not Entitled to Qualified Immunity

Defendants wrongly claim that they are protected by qualified immunity. Plaintiffs' right to be free from retaliation for refusing to support Governor-elect Dunleavy's agenda was clearly established at the time of their discharge, and no reasonable official could have

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

believed it was lawful to fire them. Defendants therefore cannot escape liability for depriving Drs. Blanford and Bellville of their First Amendment rights.

Defendants may be "entitled to qualified immunity only 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *DiRuzza v. Cty. of Tehama*, 206 F.3d 1304, 1313 (9th Cir. 2000) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Plaintiffs must show that the right at issue was clearly established, but Defendants "must prove that [their] conduct was reasonable." *Id.*

Courts in this circuit "first look to binding precedent to determine whether a right is clearly established." *Moonin v. Tice*, 868 F.3d 853, 868 (9th Cir. 2017). If no binding precedent exists, courts will then "look to whatever decisional law is available, including relevant decisions of other circuits, state courts, and district courts." *Id.* (citations and quote marks omitted). Government officials can be "on notice that their conduct violates established law even in novel factual circumstances." *Porter v. Bowen,* 496 F.3d 1009, 1026 (9th Cir. 2007) (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)). Thus, previous cases need not be "fundamentally similar"; what matters is that government

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

actors have "fair warning" that their actions are unconstitutional. *Hope*, 536 U.S. at 731. *See also Karl v. City of Mountlake Terrace,* 678 F.3d 1062, 1073 (9th Cir. 2012) (even "closely analogous preexisting case law" not required).

When Defendants made their resignation demand in November 2018, and when they fired Plaintiffs for refusing to submit to that demand in December 2018, the law was clearly established that "[g]overnment officials may not discharge public employees for refusing to support a political party or its candidates, unless political affiliation is a reasonably appropriate requirement for the job in question." *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714 (1996). It was equally clear, as it has been for decades, that requiring an "individual to communicate by word and sign his acceptance of the political ideas" advanced by a public body violates the right to free speech. *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 631 (1943). Speaking directly to the principles announced in *Barnette*, the United States Supreme Court said:

> Compelling individuals to mouth support for views they find objectionable violates [the] cardinal constitutional command [of *Barnette*], and in most contexts, any such effort would be universally condemned. Suppose, for example, that the State of Illinois required all residents to sign a document expressing support for a particular set of

> positions on controversial public issues—say, the platform of one of the major political parties. No one, we trust, would seriously argue that the First Amendment permits this.

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463–64 (2018).

No reasonable official could have concluded that the resignation demand was not a request to support a partisan platform. The demand sought an affirmation from each recipient that they wanted to work "in the Dunleavy administration," and on the Dunleavy "agenda." Pl. Mtn. Ex. 4 at 2. And Mr. Babcock explicitly said that the intended message of the resignation demand was, "'Do you want to work on this agenda, do you want to work in this administration?' Just let us know." *Id.* Reinforcing this message, Mr. Dunleavy said the demand was meant "to give people an opportunity to think about whether they want to remain with this administration . . . ." *Id.* Furthermore, the coercive nature of the demand was obvious to everyone: in Mr. Babcock's words, any employee who didn't express such "a positive desire," would be letting Defendants know they "just wish to be terminated." *Id.* at 3.

The partisanship at the heart of the demand was also obvious to others. For example, several state legislators wrote to the governor-elect to urge him to reverse course, noting that many of the employees

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

who received the demand were not "political," who swore "an oath to uphold and defend the U.S. and Alaska Constitutions, not a pledge to support any particular state chief executive." Pl. Mtn, Ex. 5 at 1. To these legislators, the demand made employees "feel intimidated into specific allegiance to the Dunleavy administration." *Id.* Other observers, such as one former state district attorney, saw the same thing: "I never once asked anyone who worked for me if they're Republican, Democrat or independent. It never mattered. And now it seems like it might matter." Pl. Mtn., Ex. 8 at 3.

Just as the partisan nature of the demand was obvious, no reasonable official could have concluded that vast numbers of the resignation demand's recipients were not policymakers. The demand targeted almost all at-will, or exempt employees. It has been well established in Alaska, since 1985, that "[n]ot every [state employee] in the exempt service is a confidential [or policymaking] employee." *Zerbetz v. Alaska Energy Ctr.*, 708 P.2d 1270, 1277 (Alaska 1985), and that "[e]xempt" defines a "category of jobs which, for whatever reason, the Legislature wanted to exclude from the state personnel system." *Id.* at 1277. It was also well-established by statute that these jobs included pharmacists and physicians, petroleum engineers and petroleum

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

geologists, the state medical examiner and all assistant medical examiners, insurance actuaries or assistant actuaries, and the entire staffs of numerous independent agencies. *See* AS 39.25.110.

Furthermore, no reasonable official could have concluded that either Dr. Blanford or Dr. Bellville were policymakers whose First Amendment rights were diminished because "political considerations" were "appropriate requirements for the effective performance" of their jobs. *Hunt v. Cty. of Orange*, 672 F.3d 606, 611–12 (9th Cir. 2012). As explained above in this Opposition, none of the policymaker indicia set out in *Hunt* or even *Fazio* even suggest that Dr. Blanford's position made him a legitimate political target. The same is even more true for Dr. Bellville, whom Defendants do not even suggest was a policymaker now. All of the aspects of both Plaintiffs' jobs that make it clear they were *not* policymakers would have been clear to a reasonable official acting at the time Defendants fired them. *DiRuzza v. Cty. of Tehama*, 206 F.3d 1304, 1314 (9th Cir. 2000) (fact showing the plaintiff was not a policymaker "would have been well known" to officials).

Finally, as is abundantly clear, no reasonable official could have concluded that firing Drs. Blanford and Bellville for refusing to state their willingness to work on the Dunleavy agenda was constitutionally

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

permissible. The United States Supreme Court explicitly held in 1996 that "government may not make public employment subject to the express condition of political beliefs or prescribed expression." *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 717 (1996). For all of these reasons, individual Defendants Dunleavy and Babcock cannot be immune for their actions.

### E. Defendants Violated the Covenant of Good Faith and Fair Dealing

Defendants insist that they did not violate the covenant of good faith and fair dealing when they terminated Plaintiffs' employment. Defendants assert that because they committed no constitutional violation, the covenant could not have been breached. This argument, however, misstates the law, as well as Plaintiffs' claims. Defendants' attempt to avoid liability on this claim therefore fails.

All at-will employment in Alaska is governed by an implied covenant of good faith and fair dealing. *Mitchell v. Teck Cominco Alaska Inc.*, 193 P.3d 751, 760 (Alaska 2008); *Montella v. Chugachmiut*, 283 F. Supp. 3d 774, 779 (D. Alaska 2017). The covenant "has both a subjective and an objective component: the subjective component 'prohibits an employer from terminating an employee for the purpose of depriving the employee of the contract's benefits,' and the objective

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

component 'prohibits the employer from dealing with the employee in a manner that a reasonable person would regard as unfair.'" *Mitchell v. Teck Cominco Alaska Inc.*, 193 P.3d 751, 761 (Alaska 2008) (quoting *Belluomini v. Fred Meyer of Alaska, Inc.,* 993 P.2d 1009, 1012 (Alaska 1999). "Unfair actions include disparate employee treatment, terminations on grounds that are unconstitutional, and firing that violates public policy." *Montella*, 283 F. Supp. at 780. These are not the only ways in which the objective component can be breached, however, because "the covenant of good faith and fair dealing includes multiple expectations about the behavior of the parties to a contract." *Luedtke v. Nabors Alaska Drilling, Inc.*, 834 P.2d 1220, 1224 (Alaska 1992). What matters is that "an employer's discretion . . . be 'exercised *reasonably and* in good faith' and that the employer's decisions . . . be made "*fairly and* in good faith.'" *Id. (*quoting *ARCO Alaska, Inc. v. Akers,* 753 P.2d 1150, 1156 (Alaska 1988)).

Plaintiffs have shown, in their Motion for Summary Judgment and in this Opposition, how Defendants have violated their First Amendment Rights and their rights under the Alaska Constitution. This demonstrates that Plaintiffs' firings were "on grounds that are unconstitutional" and establishes one way in which courts have said

the objective component of the covenant can be breached. But Plaintiffs' claims for breach of the covenant do not rise or fall on their constitutional claims alone. Plaintiffs also claim that their terminations were simply "unfair." *See* Complaint (Docket 1-1) ¶¶ 69–79.

In this case, regardless of whether the firings were unconstitutional or violations of a particular public policy, it was fundamentally unfair for Defendants to terminate the employment of Drs. Blanford and Bellville solely because they had failed to respond to a partisan stress test. Neither doctor was hired with the expectation that their jobs would be responsive to partisan politics, and nothing in their job descriptions or in the policies they were required to follow suggested that they might be required to forfeit their positions with a change of administration. Neither was in a policymaking role that would have suggested otherwise, and neither was ever told that their duties were implicated by any political agenda. Both doctors had a reasonable expectation, therefore, that they were not directly accountable to the governor in the ordinary course of their duties, and that their employment was under the "supervision, direction, and control" of the DHSS commissioner in accordance with statute. *See* AS 44.17.040 ("Each person appointed to a subordinate position

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

established by the principal executive officer is under the supervision, direction, and control of the officer.")

Defendants assert that Plaintiffs were treated fairly because Adam Crum, the newly-appointed DHSS commissioner, tried to get them to return to their jobs after they were discharged. Def. Mtn. at 21, 22. But this is beside the point. It does not diminish the fact that Plaintiffs were fired from their jobs in the first place. Moreover, Defendants' telling of this "return-to-work" offer is not supported by the evidence. Both Plaintiffs, as well as Albert Wall, the then-deputy DHSS commissioner, have stated that, rather than offering them their jobs, Mr. Crum asked them to change their minds about "submitting a letter of interest to remain in their positions . . . ." Pl. Mtn at 10. Both Plaintiffs were therefore being asked to do the same thing by Mr. Crum that had been demanded of them by Mr. Dunleavy and Mr. Babcock, something they had already refused to do. *Id.*

Furthermore, it was fundamentally unfair for Defendants to terminate Plaintiffs' employment *simply for their failure to resign*. Assuming, for the sake of argument, that Defendants are correct to say that the resignation demand served no partisan purpose, what purpose, then, did it serve? If an employer imposes a condition of employment

simply because it can, and then fires any employee who cannot or who refuses to meet the condition, that is the epitome of unfairness. Such arbitrary treatment certainly exceeds the bounds of expected good faith the covenant places on an employer.

What's more, the demand itself was intrinsically unfair. It set up a Hobson's choice—either resign or be fired—for no legitimate reason and without any compromise. For the scores of state workers whose jobs did not require political allegiance, but who had been placed, "for whatever reason," in the exempt category of employment, this made no sense. *Zerbetz*, 708 P.2d at 1277. If you wanted your job, you had to resign from it. But failure to resign meant you didn't want your job, because the consequence was termination. It is easy to see, therefore, why so many employees were anxious and confused about this demanded Catch-22. Pl. Mtn. at 3.

Under any measure, regardless of whether Defendants' termination of Plaintiffs' employment was unconstitutional, it offended basic reasonable principles of fairness. Defendants' actions therefore violated the implied covenant of good faith and fair dealing. Defendants' request to dismiss this claim should be denied.

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*

## CONCLUSION

Defendants have failed to carry their burden to show that Dr. Blanford was a policymaking employee, and the facts demonstrably show that he was not. Nor have Defendants shown that Plaintiffs' refusal to speak lacks protection under the First Amendment or the Alaska Constitution, for any reason. Likewise, Defendants claim of qualified immunity falls short because a reasonable government official would have had fair notice of Plaintiff's clearly established rights. And Defendants' attempts to avoid liability for breach of the covenant of good faith and fair dealing fail, because Plaintiffs' firings were fundamentally unfair even in the absence of a constitutional violation. Accordingly, Defendants' Motion for Summary Judgment should be denied in its entirety.

Dated May 14, 2021.

By: s/*Stephen Koteff*

Stephen Koteff, Bar No. 9407070
Joshua A. Decker, Bar No. 1201001
ACLU OF ALASKA FOUNDATION
1057 West Fireweed Lane, Suite 207
Anchorage, AK 99503
(907) 263-2007 (telephone)
skoteff@acluak.org
jdecker@acluak.org

*Counsel for Plaintiffs Anthony L. Blanford and John K. Bellville*

**ACLU OF ALASKA FOUNDATION**
1057 W. Fireweed Ln. Suite 207
Anchorage, Alaska 99503
TEL: 907.258.0044
FAX: 907.258.0288
EMAIL: *legal@acluak.org*