```
 1              UNITED STATES DISTRICT COURT
                     DISTRICT OF ALASKA
 2

 3    ANTHONY L. BLANFORD and
      JOHN K. BELLVILLE,
 4
             Plaintiffs,
 5
      MICHAEL J. DUNLEAVY, in his
 6    individual and official capacities;
      TUCKERMAN BABCOCK; and the
 7    STATE OF ALASKA,

 8           Defendants.
      _____/
 9    Case No. 3:19-cv-00036-JWS

10

11

12    _____

13       VIDEOCONFERENCE DEPOSITION OF GAVIN CARMICHAEL
      _____
14

15

16                    Pages 1 - 101
                Thursday, January 7, 2021
17                      9:00 a.m.

18

19         Taken by Counsel for Plaintiffs
              Via Remote Videoconference
20

21

22

23

24

25
```

**CERTIFIED TRANSCRIPT**

Exhibit 1, Page 1 of 10
Opposition to Defendants' Motion
for Summary Judgment

PACIFIC RIM REPORTING
907-272-4383

Case 3:19-cv-00036-JWS   Document 62-1   Filed 05/14/21   Page 1 of 10

```
 1                A-P-P-E-A-R-A-N-C-E-S

 2

 3    For Plaintiffs:

 4        STEPHEN KOTEFF
          AADIKA SINGH
 5        ACLU OF ALASKA FOUNDATION
          1057 West Fireweed Lane, Suite 207
 6        Anchorage, Alaska 99503
          907/263-2007
 7        skoteff@acluak.org

 8
      For Defendants:
 9
          MICHAEL B. BAYLOUS
10        LANE POWELL
          1600 A Street, Suite 304
11        Anchorage, Alaska 99501
          907/277-9511
12        baylousm@lanepowell.com

13
      Court Reporter:
14
          LESLIE J. KNISLEY
15        PACIFIC RIM REPORTING
          711 M Street, Suite 4
16        Anchorage, Alaska  99501

17
      Also Present:
18
          JOHN K. BELLVILLE
19

20

21

22

23

24

25
```

```
 1                        I-N-D-E-X

 2    EXAMINATION BY                                    PAGE

 3       Mr. Koteff                                        4

 4                         EXHIBITS

 5    NUMBER               DESCRIPTION                  PAGE

 6       1     Defendants' Responses to Plaintiffs'       69
              First Discovery Requests
 7            (8 pages)
```

```
 1        ANCHORAGE, ALASKA; THURSDAY, JANUARY 7, 2021
 2                         10:00 A.M.
 3                           -oOo-
 4                       GAVIN CARMICHAEL,
 5     deponent herein, being duly sworn under oath,
 6         was examined and testified as follows:
 7                        EXAMINATION
 8   BY MR. KOTEFF:
 9     Q    Okay.  Mr. Carmichael, you can put your
10   hand down.
11          My name's Steve Koteff. I'm the attorney
12   representing the plaintiffs in this case, Drs.
13   Bellville and Blanford.
14          Can you hear me okay?
15     A    Yes.
16     Q    All right.  Before we actually get
17   started, let me make sure that we understand where
18   you are.
19          Are you in a place where you can see the
20   screen adequately, and can you see me?
21     A    Yes, I can see you just fine.
22     Q    All right.  And is there anybody else
23   there with you in the room?
24     A    No, nobody else in the room.  My wife's
25   traveling through taking care of house chores from
```

```
 1   used as to what the governing board did.
 2            But the CEO of API is essentially
 3   given -- let's break it down into categories.
 4   You're given a budget, and then you figure out how
 5   to move those dollars around to make your budget
 6   work within the state.  So you don't really have a
 7   for-profit organization where you'd have a profit
 8   and loss statement.  You'd have EBITDA and things
 9   like that.  That's earnings before interest, taxes,
10   depreciation, and amortization.  So you don't have
11   that type of a model for your budget.
12            So now we have lots of dollars, and then
13   you figure out how to allocate those dollars.  And
14   92 to 95 percent of it is payroll.  So your
15   disposable budget is essentially -- that payroll is
16   essentially burned up by pharmacy and facilities
17   maintenance and things like that.  So not a lot of
18   discretionary dollars to choose about how to use.
19            As for policy, you essentially can make
20   internal policy that is not large scale.  If you
21   want to make a clinical policy, that obviously has
22   to be cleared through the governing board, through
23   the commissioners, et cetera.  That's just the way
24   that kind of works because the policies you make at
25   API affect patients and clients statewide that are
```

1  sitting in hospitals, that are in villages, that
2  are elsewhere.  So it's not just -- you can't make
3  unilateral decisions to serve the hospital.  So a
4  policy decision is a centralized process within the
5  walls and the confines of the 220,000 square feet
6  of API.  Many people feed their information into
7  what's going to become the policy at API in terms
8  of admissions and clinical, et cetera.
9           So if you want to break down -- the next
10 thing -- let's break another branch down.  So we
11 talked about budget; we talked about policy.
12 Personnel issues, largely personnel issues that
13 occur within API for the -- how do I say this --
14 for the nonphysician, nonclinical staff, nonmedical
15 staff.  The medical staff is kind of a lightning
16 rod.  So that is highly influenced by the process.
17          So as CEO you could say:  Yeah, let's
18 hire Dr. John Smith, for example -- a fictitious
19 name.  But in order to do that, you need to reach
20 out to the HR team.  You've got to get the deputy
21 commissioner for finance to sign off on it.  The
22 governor basically has to sign off on it literally.
23 Excuse me.  It's really the chief of staff that
24 signs off on it.  So in order to hire clinical
25 positions that are exempt -- note I said exempt --

1   A   Well, once again, at API you don't just
2   arbitrarily dream up or craft policy in a vacuum.
3   It takes a cast of many to get it approved.
4   Depending on the policy, I mean, if you want to put
5   a policy in place about what are you going to do
6   with people's petty cash fund when it comes in?
7   You could largely do that at the organization
8   level, but if you have policies that are going to
9   affect the intake of patients statewide, then that
10  obviously is bounced above people outside the
11  hospital, the commissioner or deputy commissioner,
12  governing board, et cetera.
13  Q   Here it refers to "inpatient psychiatric
14  healthcare policies and programs."
15      Is that an accurate descriptor of the
16  type of policies, then?
17  A   Yes.
18  Q   So I just want to make sure I understand
19  that this refers to inpatient psychiatric policies
20  and programs as opposed to a policy, say, that you
21  mentioned, like petty cash, correct?
22  A   Correct, yeah.
23  Q   Then below that it says: Development,
24  revision, and implementation of policies and
25  procedures and standing orders regarding patient

1  largely covered Taku.  So they would provide
2  testimony to the courts on status of the client as
3  well as medication management requests, et cetera,
4  in an effort to work people to competence -- treat
5  people to competence.
6      Q    Other than the job duties that you first
7  described Dr. Blanford as having, before we turn to
8  this document and the duties that are described in
9  this document, can you think of any other job
10 duties that Dr. Blanford had?
11     A    Not off the top of my head, no.
12     Q    Do you feel confident that we've covered
13 everything?
14     A    Yeah.  I can't think of anything else.
15     Q    I'm going to go ahead and stop my screen
16 share so we can see each other a little bit better
17 on the screen.  If we need to come back to that
18 document, I can pull it back up.
19          With respect to any of the job duties
20 we've been discussing belonging to Dr. Blanford
21 while he was chief of psychiatry, did
22 Dr. Blanford's political affiliation have any
23 effect on how he did his job in performing any of
24 those duties?
25     A    No.

1  Q   Did who Dr. Blanford might have voted for
2  for governor have any effect on how he did any of
3  the jobs duties that we've described?
4  A   No, other than when he left.
5  Q   Right. Thank you. In your opinion, did
6  whether Dr. Blanford supported Governor Dunleavy's
7  agenda have any effect on his ability to do his job
8  duties?
9  A   No.
10 Q   Assuming you were his supervisor as the
11 CEO, would Dr. Blanford's support or nonsupport for
12 Governor Dunleavy affect your ability to have trust
13 or confidence in his performance?
14 A   No. I knew where he stood.
15 Q   You've described your role as CEO and
16 those that you reported to. Did Dr. Blanford have
17 any direct line or communication to those people
18 above you, say, the deputy commissioner or the
19 commissioner?
20 A   So, you know, if there was obviously a
21 clinical question that a commissioner or deputy
22 commissioner had, I don't remember ever having a
23 problem ever calling, you know, or Valerie Davidson
24 ever calling directly to Dr. Blanford to my
25 knowledge. Could have happened. It's not unheard

```
 1   I would say unanimously, amongst the -- I can't
 2   think of a time when -- I've never -- and you can
 3   shut me up any time if you want, Michael.  But I
 4   can tell you that I've never seen nor can I recall
 5   a time when his clinical judgment was dissented by
 6   another provider.  It's never happened while I was
 7   there or in any meeting I was ever involved in.
 8       Q    In your opinion was his -- and we should
 9   say Dr. Blanford's clinical judgments ever
10   influenced by the politics that may have -- forgive
11   me, I'm having a little trouble getting this out.
12            Was his clinical judgment ever influenced
13   by political considerations, the kind of which
14   we've discussed earlier in this discussion?
15       A    No.  You know, I'll give you an example.
16   I see what you're saying.  What you're talking
17   about is, let's say, perhaps we have a patient at
18   API that has committed some heinous act within
19   society.  Let's put it that way.  A very high
20   profile act.  There would be pressure to do one
21   thing or another.  When I say "pressure", it's not
22   that there was the governor or the commissioner or
23   anybody called down and said:  Hey, do this with
24   this patient.  That was not the spirit.  That's not
25   the culture.  That was not what happened.
```