IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

ANTHONY L. BLANFORD and
JOHN K. BELLVILLE,

                Plaintiffs,

    vs.

MICHAEL J. DUNLEAVY, in his
individual and official capacities;
TUCKERMAN BABCOCK; and the
STATE OF ALASKA,

                Defendants.

Case No. 3:19-cv-00036-JWS

**ORDER ON MOTIONS FOR
SUMMARY JUDGMENT
[Docs. 54, 55]**

## I.   MOTIONS PRESENTED

At docket 54, Plaintiffs, Anthony L. Blanford and John K. Bellville (collectively "Plaintiffs"), filed a motion for summary judgment on their claims that Defendants, Governor Michael J. Dunleavy, Tuckerman Babcock, and the State of Alaska (collectively "Defendants"), violated their rights under the First Amendment of the United States Constitution, and Article I, § 5 of the Alaska Constitution. Defendants responded at docket 61. Plaintiffs replied at docket 64. Defendants filed their cross-motion for summary judgment at docket 55. Plaintiffs responded at docket 62. Defendants replied at docket 63. Oral argument was requested, but was denied at docket 66 because it would not be of further assistance to the Court's determination.

## II. BACKGROUND

In November 2018, Defendant Michael J. Dunleavy was elected Governor of the State of Alaska. He selected Defendant Tuckerman Babcock to serve as the chair of his transition team. Part of any transition process requires appointing subordinate executive branch officials, which necessarily involves replacing officials that served under the prior administration. In past transitions, incoming administrations requested resignations from around 250 employees.[1] Governor Dunleavy significantly broadened the scope of this practice when, on November 16, 2018, Mr. Babcock, as the chair of the Governor-Elect's transition team, sent a memorandum to most of the state's at-will employees—numbering at least 800 and including not only department heads, but also criminal prosecutors, state attorneys, medical doctors, psychiatrists, pharmacists, fiscal analysts, tax code specialists, investment managers, geologists, accountants, IT professionals, and administrative law judges.[2] The memorandum required employees to submit a resignation, along with a statement of interest in remaining employed with the new administration. The memorandum stated in part as follows:

> In the coming weeks, the incoming administration will be making numerous personnel decisions. Governor-Elect Dunleavy is committed to bringing his own brand of energy and direction to state government. It is not Governor-Elect Dunleavy's intent to minimize the hard work and effort put forth by current employees, but rather to ensure that any Alaskan who wishes to serve is given proper and fair consideration.

---

[1] Dockets 54-4; 54-5.
[2] Dockets 54-5; 54-6; 54-7.

As is customary during the transition from one administration to the next, we hereby request that you submit your resignation in writing on or before November 30, 2018 to Team2018@alaska.gov. If you wish to remain in your current position, please make your resignation effective upon acceptance by the Dunleavy administration.

Acceptance of your resignation will not be automatic, and consideration will be given to your statement of interest in continuing in your current or another appointment-based state position. Please also include your email address and phone contact so that you can be reached to discuss your status directly.

Governor-Elect Dunleavy is encouraging you and all Alaskans to submit their names for consideration for service to our great state. . . .[3]

The memorandum was accompanied by a resignation form, which included a sentence where employees had to choose whether or not they wanted to be considered for their position with the Dunleavy administration.[4]

Plaintiffs were among the employees who received the resignation memorandum. At that time, Dr. Blanford was the chief of psychiatry and Dr. Bellville was a staff psychiatrist at Alaska Psychiatric Institute ("API"), the State's psychiatric hospital. Dr. Blanford was hired in 2016 as a staff psychiatrist and later was promoted to the chief of psychiatry position. Dr. Bellville started at API in the spring of 2018. Dr. Blanford was surprised that he received the resignation request and Dr. Bellville initially disregarded his receipt of the memorandum as a mistake, because they did not

---

[3] Docket 54-1.
[4] Docket 54-3.

consider their jobs to be political in nature and both were professionally well-regarded at API.[5]

The demand for the resignations of all at-will employees was reported in the local newspaper. Governor Dunleavy explained his decision to a reporter: "We want to give people an opportunity to think about whether they want to remain with this administration and be able to have a conversation with us."[6] Mr. Babcock was reported as saying as follows:

> [Governor Dunleavy] just wants all of the state employee who are at-will . . . to affirmatively say, "Yes, I want to work for the Dunleavy administration,". . . Not just bureaucracy staying in place, but sending out the message, "Do you want to work on this agenda, do you want to work in this administration? Just let us know."
>
> . . . .
>
> . . . I do think this is something bold and different, and it's not meant to intimidate or scare anybody. It's meant to say, "Do you want to be a part of this?"
>
> . . . .
>
> If you don't want to express a positive desire, just don't submit your letter of resignation, . . . [a]nd then you've let us know you just wish to be terminated.[7]

Upon reading these comments, Dr. Blanford became concerned about the propriety of having to sign what he considered a "pledge . . . to a political agenda" in his role as chief of psychiatry at API.[8] He voiced his opposition to the resignation demand in a

---

[5] Dockets 54-14 at ¶ 9; 54-15 at ¶ 8; 54-13 at 8; 56-6 at 2.
[6] Docket 54-4.
[7] *Id.*
[8] Docket 54-14 at ¶¶ 10–13.

letter to the editor of the newspaper.[9]  He indicated in the published letter that he wanted to keep his job at API, but would not submit a "symbolic gesture of deference" in order to keep it.[10]  He stated he was hired for his expertise and not his "political allegiance," and that he could not voice his support for the administration's agenda if it involved "further cuts and hiring freezes, because that's not what's needed at API at this time."[11]  He stated his "moral allegiance" is to the mentally ill and staff who care for them and that it was his belief that "[p]olitics have already cut deeply into our ability to care for the mentally ill."[12]  Dr. Bellville agreed with Dr. Blanford's position.[13]

Neither psychiatrist submitted his resignation.  In the morning of December 3, 2018, the day Governor Dunleavy was sworn into office, Mr. Babcock notified Plaintiffs of their termination from service effective at noon that same day.[14]  While no basis was provided in the notifications, Defendants concede that Plaintiffs were fired because they failed to submit their resignations.[15]  Administration officials later requested to meet with Plaintiffs to encourage them to stay at API, but maintained the condition that Plaintiffs reapply with the new administration.[16]  Plaintiffs understood that they could have their jobs on the original condition—by submitting a

---

[9] Docket 54-21.
[10] Id.
[11] Id.
[12] Id.
[13] Docket 54-15 at ¶¶ 10–13.
[14] Dockets 54-22; 54-23.
[15] Docket 58 at ¶ 3.
[16] Dockets 56-8 at 4–5; 54-25 at 9; 54-14 at ¶ 20; 54-15 at ¶ 18.

Blanford, et al. v. Dunleavy, et al.
Order on Motions for Summary Judgment

Case No. 3:19-cv-00036-JWS
Page 5

Case 3:19-cv-00036-JWS   Document 71   Filed 10/08/21   Page 5 of 37

letter of intent or otherwise specifically articulating their interest in being employed at API under the new administration, which they again refused to do, believing the demand to be a political one to which they objected.[17]

This lawsuit followed. Plaintiffs assert a 42 U.S.C. § 1983 claim against Defendants for violation of their First Amendment rights, as well as a free speech claim under Article I, § 5 of the Alaska Constitution. Plaintiffs also allege a breach of the implied covenant of good faith and fair dealing under state law. They seek monetary relief, as well as injunctive and declaratory relief.

Plaintiffs now seek summary judgment on their federal and state free speech claims. Defendants, in turn, seek summary judgment on these same claims. They also ask for summary judgment as to Plaintiffs' state claim for the breach of the covenant of good faith and fair dealing.

## III. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[18] The materiality requirement ensures that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[19] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[20]

---

[17] Dockets 54-14 at ¶¶ 20–21; 54-15 at ¶¶ 18–19.
[18] Fed. R. Civ. P. 56(a).
[19] *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[20] *Id.*

However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[21]

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[22] Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the moving party need not present evidence to show that summary judgment is warranted; it need only point out the lack of any genuine dispute as to material fact.[23] Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[24] All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant.[25] However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[26] "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary

---

[21] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[22] *Id.* at 323.
[23] *Id.* at 323–25.
[24] *Anderson*, 477 U.S. at 248–49.
[25] *Id.* at 255.
[26] *Id.* at 248–49.

material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them."[27]

## IV.   DISCUSSION

### A.   Plaintiffs' § 1983 Claim Based on the First Amendment

Plaintiffs assert their First Amendment retaliation claim against Defendants pursuant to 42 U.S.C. § 1983. Section 1983 creates a private right of action for those plaintiffs seeking to redress and remedy constitutional wrongs caused by those acting "under the color of state law."[28] "To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law."[29] Based on Eleventh Amendment considerations, a state, its agencies, and officials acting in their official capacity cannot be sued under § 1983.[30] An exception exists for § 1983 claims brought against state officials sued in their official capacity for prospective injunctive or declaratory relief.[31] These claims, however, must be brought against state officials with the ability to provide injunctive relief in their official capacities.[32] Claims seeking

---

[27] *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001).

[28] 42 U.S.C. § 1983.

[29] *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006).

[30] *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Wolfe v. Strankman*, 392 F.3d 358, 364 (9th Cir. 2004).

[31] *Will*, 491 U.S. at 71 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the state.'" (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985))); *Flint v. Dennison*, 488 F.3d 816, 824–25 (9th Cir. 2007).

[32] *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013).

monetary damages may only be brought against a state official if the official is sued in his or her individual capacity and such claims are subject to a possible qualified immunity defense. [33]  For these personal-capacity claims, Eleventh Amendment immunity issues are not implicated because the claim is actually against the individual and not the state. [34]  To establish personal liability for damages under § 1983, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. [35]

Under these principles, Plaintiffs' § 1983 claim against the State of Alaska itself is not viable.  The claim may be brought against Defendant Dunleavy in his official capacity for prospective injunctive and declaratory relief, and against the individual Defendants in their personal capacities for damages.  Whether Plaintiffs are entitled to summary judgment on this § 1983 claim depends on whether there has been an underlying First Amendment violation and, if so, whether Defendants are entitled to qualified immunity.

### 1.    First Amendment in the public employment context

Plaintiffs' § 1983 claim against Defendants falls within the ambit of case law governing First Amendment rights in relation to public employment.  "The Court has rejected for decades now the proposition that a public employee has no right to a government job and so cannot complain that termination violates First Amendment

---

[33] *Suever v. Connell*, 579 F.3d 1047, 1060–61 (9th Cir. 2009); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

[34] *Suever*, 579 F.3d at 1060.

[35] *Id.*

rights . . . ."[36]  Under the Supreme Court's "unconstitutional conditions" doctrine, "the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech' even if he has no entitlement to that benefit."[37]  Based on this doctrine, "[i]t is by now black letter law that 'a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'"[38]  This means that "[a]bsent some reasonably appropriate requirement, government may not make public employment subject to the express condition of political beliefs or prescribed expression."[39]

Stemming from these principals are two types of cases—those falling under the *Elrod/Branti*[40] line of patronage cases, and those under the *Pickering*[41] free speech retaliation cases.  Under *Elrod/Branti*, as a general rule, public employees cannot be terminated based upon their political associations.[42]  Such patronage practices impermissibly infringe upon public employees' First Amendment rights.  "The threat of dismissal for failure to provide [support for the favored political party] unquestionably inhibits protected belief and association, and dismissal for failure to provide support only penalizes its exercise."[43]

---

[36] *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 716 (1996).
[37] *Bd. of Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 674 (1996) (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)).
[38] *Nichols v. Dancer*, 657 F.3d 929, 932 (9th Cir. 2011) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)).
[39] *O'Hare*, 518 U.S. at 717.
[40] *Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980).
[41] *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563 (1968).
[42] *Biggs v. Best, Best & Krieger*, 189 F.3d 989, 994 (9th Cir. 1999).
[43] *Elrod*, 427 U.S. at 359 (plurality opinion).

*Blanford, et al. v. Dunleavy, et al.*
Order on Motions for Summary Judgment
Case No. 3:19-cv-00036-JWS
Page 10

Case 3:19-cv-00036-JWS   Document 71   Filed 10/08/21   Page 10 of 37

*Pickering* retaliation cases involve situations where a government employer takes an adverse employment action against an employee in response to that employee's speech. Under these cases, it is acknowledged that the government cannot unduly abridge employees' free speech rights, but nonetheless has broader power to restrict the speech of its employees than the speech of its constituents given the different interests at play. As a result, unlike the *Elrod*/*Branti* cases "where the raw test of political affiliation suffice[s] to show a constitutional violation," these speech-related cases require the application of a balancing test developed in *Pickering* to determine whether the employee's speech is constitutionally protected.[44] Under the balancing test, the court must consider "the interests of the [employee], as a citizen, in commenting upon matters of public concern, and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."[45] This balancing test is also applied in "hybrid speech/association" claims, where speech is inextricably linked with the associational activity in question.[46]

Under both types of cases—whether involving political affiliation or political speech—an exception is carved out for those employees holding policymaking positions; such employees may be fired for "purely political reasons."[47] In the Ninth Circuit, "an employee's status as a policymaking or confidential employee [is] dispositive of *any* First Amendment retaliation claim[,]" not just a claim based

---

[44] *O'Hare*, 518 U.S. at 719.
[45] *Pickering*, 391 U.S. at 568.
[46] *Hudson v. Craven*, 403 F.3d 691, 695–98 (9th Cir. 2005); *Candelaria v. City of Tolleson, Ariz.*, 721 Fed. Appx. 588, 590 n.1 (9th Cir. 2017).
[47] *Hobler v. Brueher*, 325 F.3d 1145, 1150 (9th Cir. 2003).

solely on political affiliation.[48]   This exception reflects the view that dissenting political speech, beliefs, or affiliations from a policymaker is disruptive enough that the government's interests will necessarily permit patronage-based dismissals.[49] However, "the exception is 'narrow' and should be applied with caution."[50]   Whether an employee falls within this classification is not simply a matter of labels and titles; rather, "the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."[51]   Party affiliation is interpreted broadly to encompass political affiliation more generally, which "includes commonality of political purpose and support."[52]

### 2. Dr. Blanford's position as the chief of psychiatry at API

As a threshold matter, Defendants argue that they cannot be liable to Dr. Blanford for any First Amendment violation because Dr. Blanford occupied a policymaking position at API and, therefore, could be fired for purely political reasons. Defendants bear the burden of establishing Dr. Blanford occupied such a position.[53] That is, they must show that political considerations are relevant to the chief of psychiatry position at API.  The duties of this position are not disputed and, therefore,

---

[48] *Biggs*, 189 F.3d at 994–95 (emphasis added).
[49] *See Hobler*, 325 F.3d at 1150 (noting that "some positions must be subject to patronage dismissals for the sake of effective governance and implementation of policy").
[50] *Hunt v. Cnty. of Orange*, 672 F.3d 606, 611 (9th Cir. 2012) (quoting *DiRuzza v. Cnty. of Tehama*, 206 F.3d 1304, 1308 (9th Cir. 2000)).
[51] *Branti*, 445 U.S. at 518.
[52] *Walker v. City of Lakewood*, 272 F.3d 1114, 1132 (2001) (quoting *Biggs*, 189 F.3d at 996).
[53] *DiRuzza v. Cnty. of Tehama*, 206 F.3d 1304, 1311 (9th Cir. 2000).

whether it constitutes a policymaking one is a question of law amenable to summary judgment.[54]

The Ninth Circuit has set forth nine factors that can be relevant when determining the nature of a position for purposes of the policymaking exception under the First Amendment. These factors are as follows: (1) vague or broad responsibilities; (2) relative pay; (3) technical competence; (4) power to control others; (5) authority to speak in the name of policymakers; (6) public perception; (7) influence on programs; (8) contact with elected officials; and (9) responsiveness to partisan politics and political leaders.[55] These factors do not need to be applied mechanically, but rather should act as a guide to the underlying purpose and intent of the exception.[56]

As chief of psychiatry, Dr. Blandford supervised the medical, pharmacy, and social work departments at API.[57] He was involved in hiring decisions, and evaluated and disciplined staff members within these departments.[58] He performed administrative tasks such as running department meetings, completing documentation, and ensuring compliance with various medical laws, policies, procedures, and standards of care.[59] He oversaw patient care and clinical services.[60] His supervisor was the CEO, and the CEO, in turn, was supervised by API's 11-member "Governing

---

[54] *Walker*, 272 F.3d at 1132.
[55] *Fazio v. City & Cnty. of San Francisco*, 125 F.3d 1328, 1334 n.5 (9th Cir. 1997).
[56] *Hunt*, 672 F.3d at 611–12.
[57] Docket 62-2 at 2, ¶ 2.
[58] Dockets 54-14 at ¶ 4; 62-2 at 3, ¶ 6.
[59] Dockets 56-4; 56-5; 54-14 at ¶ 4.
[60] Dockets 56-4; 56-5; 54-14 at ¶¶ 3–4.

Body."[61]  The Governing Body "is responsible for broad policy making in accordance with applicable State of Alaska laws and regulations."[62]  Its authority is delegated to it by the Commissioner of Health and Social Services, and it "is empowered to determine and maintain the objectives, purposes, and values of the Hospital," to hire and fire the CEO, and approve budgets, bylaws, rules, regulations, policies, and procedures of API.[63]  Dr. Blanford was not a member of the Governing Body.[64]

Based on the record provided, including the duties of Dr. Blanford as chief of psychiatry and the structural organization of API, the Court concludes that political affiliation was not a requirement for the effective performance of his job at API.  Gavin Carmichael, API's CEO at that time and Dr. Blanford's supervisor, confirmed that Dr. Blanford's support of Governor Dunleavy's agenda and his particular political affiliations had no influence on any of his job responsibilities.[65]  He confirmed that Dr. Blandford's clinical judgment was not influenced by political considerations.[66]  Furthermore, the evidence does not show that he had contact with elected officials or that he spoke on behalf of those officials as chief of psychiatry.  His duties were distinct and clear, involving patient care, compliance, and medical services and staff management.

---

[61] Docket 62-2 at 2, ¶ 5; *id.* at 5; *id.* at 14.
[62] *Id.* at 17.
[63] *Id.* at 14, 17, 19.
[64] *Id.* at 4, ¶ 11.
[65] Docket 62-1 at 8–9.
[66] *Id.* at 10; Docket 54-13 at 10.

Defendants argue that Dr. Blanford's control over subordinate medical staff is a factor that weighs in favor of finding that his position was a policymaking one. They argue that he supervised a large number of skilled medical staff, including over 140 nurses. Looking at the record, however, that number is disputed. While a memorandum dated June 4, 2018, from the Department of Health and Social Services indicates that the duties of chief of psychiatry include supervising the nursing department at API,[67] and Mr. Carmichael testified that the nursing department reported to Dr. Blanford,[68] the organizational chart provided by Plaintiffs demonstrates that the nursing department was overseen by a separate director of nursing, who reported to the CEO.[69] Both Mr. Carmichael and Dr. Blanford stated that he only directly supervised about fifteen people.[70] Even assuming the chief of psychiatry supervised the entire nursing staff at API, this alone would not show that political affiliation is part of the job, as simply increasing the number of medical personnel under his supervision does not sufficiently demonstrate in and of itself that he affected the administration's political policy goals.[71]

Defendants argue that his supervision of the nurses bled into influential policy decisions, such as when he "negotiated with the nurses' union" and ultimately solved a staffing issue.[72] However, the deposition testimony that Defendants rely upon

---

[67] Docket 56-5.
[68] Docket 56-3 at 5.
[69] Docket 62-2 at 5; *id.* at 2, ¶ 3.
[70] Dockets 56-3 at 11; 62-2 at 2, ¶ 2.
[71] *Hunt*, 672 F.3d at 614 (acknowledging that merely being a supervisor is not sufficient to show status as a policymaker).
[72] Docket 55 at 5.

does not support such a conclusion about Dr. Blanford's role in the staffing changes. Mr. Carmichael stated in his deposition that he had asked Dr. Blanford to consider API's staffing model and propose a way that would allow for continuous nursing coverage at the facility, and that Dr. Blanford was able to come up with a solution that eventually was implemented.[73]  There was nothing said about Dr. Blanford himself advancing this solution or negotiating with the nurses' union.  Indeed, there is nothing in the record to suggest he had such authority.

To the contrary, Dr. Blanford's ability to make consequential policy decisions was constrained by the hierarchical system at API.  Even as the supervisor of the medical staff at API, his hiring and termination decisions had to be approved by the CEO and Governing Body.[74]  Similarly, his ability to implement or change policies and practices at API was limited.  Decisions involving clinical administrative matters, whether initiated by him as chief of psychiatry or by the CEO, had to be considered and approved by the Governing Body, which would take those matters to the applicable commissioners as necessary.[75]  Any medical policies and procedures developed by him as the chief were designed to meet medical standards of care, not policy agendas, and even those items had to be approved by the Governing Body to go into effect.[76]

Defendants also point to Dr. Blanford's salary of $298,000 a year, one of the top salaries in the executive branch, as a factor suggesting he qualifies as a

---

[73] Docket 56-3 at 11.
[74] Dockets 62-1 at 6; 62-2 at 3, ¶ 6; 62-2 at 14.
[75] Dockets 62-1 at 7; 62-2 at 3, ¶ 8.
[76] Docket 62-2 at 3, ¶ 7.

policymaker.[77]  When Dr. Blanford was first hired as a staff psychiatrist, his salary was $273,000.[78]  This salary was based on his board certification, his five years of experience, and his familiarity with API.[79]  Dr. Bellville, who Defendants do not claim was a policymaker, was hired with a similar salary of $262,500.[80]  The evidence shows that the alternative to hiring staff psychiatrists was to hire *locum tenens* psychiatrists, which cost between $550,00 and $600,000 per year, per position.[81]  Given these facts, Dr. Blanford's high salary had more to do with the cost required to hire a qualified psychiatrist as a permanent staff member and less about the level of influence he exerted over state policy and governance.  The same can be said of the technical competence possessed by Dr. Blandford.  It is no more than any other psychiatrist working at API.  Defendants have failed to show how Dr. Blanford's salary and competence as a psychiatrist is relevant to the overall purpose of the policymaking exception to the First Amendment analysis.  Given the Court's finding that Dr. Blanford did not occupy a policymaking position, his termination can implicate the First Amendment.

### 3.    Mass resignation demand as an unconstitutional patronage practice

Plaintiffs assert their terminations under Defendants' resignation plan were political in nature, raising patronage issues.  As noted above, the Supreme Court has held that patronage dismissals—where public employees are discharged or

---

[77] Docket 56-5.
[78] Docket 56-11.
[79] *Id.*
[80] Docket 54-12.
[81] Docket 56-11.

*Blanford, et al. v. Dunleavy, et al.*
Order on Motions for Summary Judgment
Case No. 3:19-cv-00036-JWS
Page 17

Case 3:19-cv-00036-JWS   Document 71   Filed 10/08/21   Page 17 of 37

threatened with discharge solely because of their partisan affiliation or lack thereof—impermissibly restrict freedoms of belief and association guaranteed under the First Amendment. In cases involving patronage practices applied to employees not holding policymaking positions, no balancing test is necessary because such practices "unquestionably inhibit protected belief and association" and "are not narrowly tailored to serve vital government interests."[82] The interest the government has in securing effective employees "can be met by discharging, demoting, or transferring persons whose work is deficient," and the interest the government has in loyally implementing its policies "can be adequately served by choosing or dismissing [only those] high-level employees on the basis of their political view" under the policymaker exception.[83]

The seminal cases addressing unconstitutional patronage involved dismissal based on party membership. In *Elrod*, a newly elected Democratic sheriff discharged certain at-will employees because they did not belong to or otherwise have the support of the Democratic party. The court found that conditioning public employment on political activity is "tantamount to coerced belief" and inhibits employees from exercising their own political beliefs.[84] In *Branti*, a newly appointed public defender had threatened to dismiss two assistant public defenders on the sole ground that they were Republicans. The Court, in finding a constitutional violation,

---

[82] *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 69, 74 (1990).
[83] *Id.* at 74.
[84] 427 U.S. at 355.

*Blanford, et al. v. Dunleavy, et al.*                              Case No. 3:19-cv-00036-JWS
Order on Motions for Summary Judgment                                                  Page 18
Case 3:19-cv-00036-JWS   Document 71   Filed 10/08/21   Page 18 of 37

clarified that "there is no requirement that dismissed employees prove that they, or other employees, have been coerced into changing, either actually or ostensibly, their political allegiance."[85]  Instead, it is enough for a plaintiff to prove that they were dismissed because they were not affiliated with the favored party.[86]

In *Rutan*, the Court revisited the *Elrod*/*Branti* doctrine to consider whether it applies to employment actions short of dismissal.  In that case, the Illinois governor issued an executive order instituting a hiring freeze, whereby state officials were prohibited from hiring any employee, filling any vacancy, or creating a new position without the Governor's express permission.  Plaintiffs in that case alleged that the Governor's hiring freeze was operating as a patronage system whereby the Governor limited employment and beneficial employment-related decisions to those affiliated with his favored party to the detriment of those not affiliated with that party. The Court held that, in line with *Elrod* and *Branti*, promotions, transfers, or recalls based on political affiliation or support impermissibly infringe on public employees' First Amendment rights.[87]  It found that the same First Amendment concerns underlying the decisions in *Elrod* and *Branti* were implicated by the governor's freeze:

> Employees who do not compromise their beliefs stand to lose the considerable increases in pay and job satisfaction attendant to promotions, the hours and maintenance expenses that are consumed by long daily commutes, and even their jobs if they are not rehired after a "temporary" layoff.  These are significant

---

[85] 445 U.S. at 517.
[86] *Id.*
[87] 497 U.S. at 75.

penalties and are imposed for the exercise of rights guaranteed by the First Amendment.[88]

As for hiring decisions, it concluded that, under the Supreme Court's long-standing precedent, "conditioning hiring decisions on political belief and association plainly constitutes an unconstitutional condition" when applied to public positions that cannot be considered policymaking ones.[89]

Party affiliation of the employee is not, in and of itself, the determinative factor in these cases. That is, neither active campaigning, nor affiliation with a competing party, nor vocal opposition to the favored political party by the employee is required to raise the issue of unconstitutional patronage. "[T]he right not to have allegiance to the official or party in power itself is protected under the First Amendment."[90] Consequently, to support a First Amendment claim under these patronage cases, it is sufficient for the employee to show "that they were fired for failing to endorse or pledge allegiance to a particular political ideology."[91]

While not as direct as the patronage practices described above, Defendants' demand for the resignations of over 800 at-will employees, with acceptance or rejection of each resignation dependent upon an accompanying statement of commitment to state employment under the incoming administration, is sufficiently analogous as to its purpose and effect to be considered an unconstitutional

---

[88] *Id.* at 74.
[89] *Id.* at 78.
[90] *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 272 (3d Cir. 2007).
[91] *Gann v. Cline*, 519 F.3d 1090, 1094 (10th Cir. 2008) (quoting *Bass v. Richards*, 308 F.3d 1081, 1091 (10th Cir. 2002)).

patronage practice. It is undisputed the resignation plan was designed to communicate to employees that they needed to express a desire to work for the Dunleavy administration in order to retain their jobs and the resignation and reapplication process was the means by which they were to do this.[92] This intent was made sufficiently clear to its recipients. The resignation memorandum itself stated that Governor Dunleavy was "committed to bringing his own brand of energy and direction to government" and asked employees to consider whether they wanted to remain in state service.[93] The resignation form provided to employees included a line where, after resigning their position, the employee had to indicate whether they wanted to be considered for their current position "with the new administration."[94] The media reports that followed solidified the nature of the request. Mr. Babcock was quoted as affirming that the purpose of the mass resignation request was to have employees commit to working for the Dunleavy administration and its agenda in particular, rather than just staying in place as part of the usual bureaucracy.[95] He stated that "[n]o public servant should ever think that they are irreplaceable,"[96] and he made it clear that their jobs were on the line. Employees who did not offer a resignation would be terminated. More specifically, he directed employees who did not want to "express a positive desire" to work with the new administration to simply not turn in a resignation, which would,

---

[92] Docket 64-1 at 7–11.
[93] Docket 54-1.
[94] Docket 54-3.
[95] Docket 54-4.
[96] Docket 54-8.

convolutedly, indicate a "wish to be terminated."[97]  In other words, to keep their jobs, employees had to actually resign it as a gesture of support and then hope that the incoming administration would reject the resignation based on unknown criteria.

Based on these circumstances, Defendants were requiring an ostensible commitment of political support, or at least deference, in return for continued employment, the effect of which was to either interfere with or chill employees' exercise of protected First Amendment rights.  Those that did not want to signal such a commitment, like Plaintiffs, were fired.  Those that complied to keep their jobs could thereafter reasonably "feel a significant obligation to support political positions held by their superiors, and to refrain from acting on the political views they actually hold" that officials might find subversive in order to avoid dismissal.[98]  As such, this threat of dismissal for failure to provide the resignation as a gesture of support for the newly elected governor "unquestionably inhibit[ed] protected belief and association."[99]

Defendants assert that there was nothing political about the resignation plan; they issued pro forma resignation requests from at-will employees as a routine part of the administrative transition process.  However, the sheer scope of the demand for resignations, which undisputedly went beyond what was customary during an administration transition, and extended to employees not occupying policymaking positions, demonstrates that the purpose went beyond routine employment action.

---

[97] Docket 54-4.
[98] *Rutan*, 497 U.S. at 73.
[99] *Elrod*, 427 U.S. at 359.

They were not actually asking at-will employees to resign en mass. Rather, they were asking employees to offer up their job to the new administration's express approval on a basis left unclear, but with suggestive political underpinnings. Indeed, Defendants did not describe it to employees as a mere formality. Rather, in connection with the resignation demand, Mr. Babcock stressed that "[n]o public servant should ever think that they are irreplaceable" and another transition team member stated that the resignation demand served as a reminder to state employees that they work for the public and that the public elected the governor.[100] Therefore, it functioned less as an employment formality and more of a hedge against, and warning to, political dissenters working in state government. At a minimum, the resignation demand had the purpose and effect of infusing political concerns and considerations into the civil service sector.[101]

The fact that actual party membership or activity did not factor into who received the resignation memorandum is not dispositive here. It is sufficient if, under Defendants' plan, employees faced potential dismissal, or other adverse employment action, if they did not want to affiliate with a particular political ideology. Such is the case here. It was made clear that by submitting a resignation, the employee was actually signaling a commitment to work with the new governor and on behalf of his agenda. This agenda was later described by Mr. Babcock to include support for a full statutory PFD, the repeal of Senate Bill 91, reorganization of government agencies,

---

[100] Dockets 54-7; 54-8.
[101] Dockets 54-2 at 2; 54-5; 54-8.

pro-life issues, and a balanced state budget.[102]  Plaintiffs did not want to align themselves with these political priorities to the extent they involved funding cuts and hiring freezes that would detrimentally affect the functioning of API, and therefore they did not submit their resignations.[103]  They consequently were fired for this exercise of their associational rights guaranteed under the First Amendment.

### 4. Retaliation for the exercise of First Amendment speech

Plaintiffs' terminations based upon their refusal to provide their resignations also implicates free speech issues under the *Pickering* line of cases.  The Ninth Circuit has synthesized *Pickering* and its progeny into a five-factor evaluation:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.[104]

The plaintiff bears the burden at the first three steps of the inquiry.  The fourth step of the analysis represents the *Pickering* balancing test, and it is at this step where the burden shifts to the government employer to show that there were legitimate administrative interests involved that outweigh the employee's interest in commenting about matters of public concern.[105]

---

[102] Docket 64-1 at 5.
[103] Docket 54-21.
[104] *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).
[105] *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004).

As a threshold matter, Defendants argue there is no speech actually at issue here. They stress that Plaintiffs were not fired for anything they said or failed to say, nor were they compelled to convey any public message in order to keep their jobs.[106] However, non-verbal conduct, such as refusing to submit a resignation, can in fact be expressive. Conduct "implicates the First Amendment when it is intended to convey a 'particularized message' and the likelihood is great that the message would be so understood."[107]

That requisite intent and understanding is present here. Dr. Blanford, upon reading the media reports, understood the resignation demand to be politically motivated. He "did not think [he] could or should have to pledge [himself] to a political agenda in order to effectively carry out [his] duties as the chief of psychiatry [at API]."[108] He even penned an editorial stating as much. In it, Dr. Blanford indicated that he wanted to continue in his role at API, but would not submit what he considered to be a "symbolic gesture of deference" to a political agenda he did not necessarily agree with and that actually may run counter to the best interests of patients and staff

---

[106] The parties brief the issue as one of compelled speech. However, as shown by the arguments made, this case does not fall neatly within the confines of that body of law. Indeed, as noted by the Supreme Court in *Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, 138 S. Ct. 2448 (2018), except for speech that is part of an employee's official duties, "it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree. And we have never applied *Pickering* in such a case." *Id.* at 2473. It went on to state that even if *Pickering* applied in a situation involving compelled speech in the public employment context, "it would certainly require adjustment." *Id.* Here, the speech issues are more accurately viewed as expressive conduct on the part of Plaintiffs rather than speech compelled by Defendants.

[107] *Nunez v. Davis*, 169 F.3d 1222, 1226 (9th Cir. 1999) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)); *Thomas*, 379 F.3d at 810 (quoting *Spence v. Washington*, 418 U.S. 405, 410–11 (1974) (per curium)).

[108] Docket 54-14 at ¶ 13.

at API.[109]  In line with this editorial, he did not submit the resignation.  Dr. Bellville agreed with Dr. Blanford's position and also did not submit the resignation.[110]  Their refusal to resign was intended to act as a repudiation of the political underpinnings of Defendants' resignation requests, and the likelihood people understood their refusal as sending such a message was indeed great.  In fact, medical staff at API wrote a letter to Defendants requesting that they not terminate Dr. Blanford despite his stated intent not to file the resignation, which they understood to be in protest of Defendants' directive.[111]  Therefore, Plaintiffs' refusal to participate clearly conveyed an implicit message of disapproval of the resignation demand, and therefore was expressive.[112]

Defendants also challenge the First Amendment's application in this situation, arguing that the resignation request was simply a job-related directive, internal to state operations, and that Plaintiffs were fired for not complying with that directive.  This argument touches upon the first two factors discussed above:  whether the expressive conduct addressed a matter of public concern, and whether it was undertaken in their capacity as private citizens or public employees.  Both of these issues are questions of law.[113]

---

[109] Docket 54-21.

[110] Docket 54-15 at ¶¶ 10–14.

[111] Docket 56-6.

[112] See *Nunez*, 169 F.3d at 1227–28 (holding that an employee's refusal to limit attendees at training seminars to those court employees who had worked on her supervisor's re-election campaign was expressive conduct on a matter of public concern).

[113] *Eng*, 552 F.3d at 1070.  The issue of whether the speech was made in the employee's capacity as a private citizen is a matter of law so long as the employee's job duties are not disputed. *Id.* at 1071.

*Blanford, et al. v. Dunleavy, et al.*
Order on Motions for Summary Judgment

Case No. 3:19-cv-00036-JWS
Page 26

The inquiry into the public concern factor requires the court to undertake a "generalized analysis of the nature of the speech."[114] The analysis considers the "content, form, and context of [the expression at issue], as revealed by the whole record"[115] to decide whether it fairly relates to a "matter of political, social, or other concern to the community."[116] "Of the three concerns, content is king."[117] When the content of the message addresses "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government," it constitutes a matter of public concern.[118] When the content involves individual personnel disputes and grievances, it does not constitute a matter of public concern.[119]

The message Plaintiffs intended to convey by refusing to comply with Defendants' directive clearly falls within the former content category. Plaintiffs were surprised to have received a resignation request, and believed the directive effectively was requiring political loyalty. The infusion of politics into what normally would be non-political civil service jobs is a matter that the community appropriately would want to know about to make an informed decision about how the new administration planned to operate. While their objection to the request was tailored to their roles as

---

[114] *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 964 (9th Cir. 2011) (quoting *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009)).
[115] *Connick v. Myers*, 461 U.S. 138, 147–48 (1983).
[116] *Id.* at 146.
[117] *Johnson*, 658 F.3d at 965.
[118] *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009) (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)).
[119] *Id.*

psychiatrists at API, it cannot fairly be characterized as simply a personnel grievance. Their refusal to comply was rooted in their concern about protecting the integrity of patient care at API from political interests, which clearly is a concern that would be of importance to the general public.

The fact that Plaintiffs' actual failure to turn in their resignations was not publicly announced is not dispositive. Speech, or expressive conduct as is the case here, about a matter of public concern may be protected even when made in a private context to staff and superiors rather than the general public.[120] Staff at API discussed the matter of resignations in a meeting and were aware of Plaintiffs' position and intent not to turn in a resignation, and they in turn signaled the issue to Defendants in a letter. Moreover, Dr. Blanford's intent and decision not to comply with the resignation demand as a form of protest was, in fact, publicized.

The inquiry into whether Plaintiffs were acting as private citizens or as public employees focuses on whether an employee's expressions were made pursuant to official responsibilities.[121] When an employee makes a statement as part of his official job responsibilities, he is acting on behalf of the government, and when that statement is unauthorized, incorrect, or improper, the First Amendment provides no protection from disciplinary measures. Defendants argue that that Plaintiffs' failure to comply with their job-related directive falls within this category—a simple refusal to follow a job directive. Determining whether the conduct at issue was job related

---

[120] *Thomas*, 379 F.3d at 810–11.
[121] *Barone v. City of Springfield, Oregon*, 902 F.3d 1091, 1098–99 (9th Cir. 2018).

requires "a 'practical' inquiry into an employee's 'daily professional activities' to discern whether the speech at issue occurred in the normal course of these ordinary duties."[122] The focus is on "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."[123] Under this case law, the fact that the subject matter of the resignation request was the job itself does not make Plaintiffs' refusal to submit their resignations job related. Offering up a resignation obviously was not part of Plaintiffs' daily activities as psychiatrists at API.

Given the foregoing analysis, Plaintiffs' refusal to resign in these circumstances is protected expressive conduct. There is no dispute that this conduct was the reason Defendants fired Plaintiffs, and that they would not have been fired but for this conduct. It therefore falls on Defendants to show that Plaintiffs' First Amendment rights are outweighed by the interest the government has "in promoting the efficiency of the public services it performs through its employees."[124] They can do this by demonstrating some actual disruption stemming from the message. This includes speech or conduct that impairs discipline, disrupts co-worker harmony, negatively impacts confidential working relationships, impedes the performance of an employee's duties, or interferes with regular operations.[125] No such showing has been made, or even asserted, here. Indeed, any such disruptive effects shown in the record

---

[122] *Id.* at 1099 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 422, 424 (2006)).
[123] *Lane v. Franks*, 573 U.S. 228, 240 (2014).
[124] *Pickering*, 391 U.S. at 568.
[125] *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

appear to be a product of the resignation plan itself.[126] Without any outweighing interests, Defendants could not terminate Plaintiffs for their protected expressive conduct without running afoul of the First Amendment.

### 5. Qualified immunity

Defendants argue that regardless of any underlying constitutional violation, they are entitled to qualified immunity that shields them from Plaintiffs' § 1983 claim for damages.[127] "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known."[128] Given the Court has found a First Amendment violation, the remaining issue to be determined is whether Plaintiffs' rights in relation to the demand for resignations and their subsequent refusal to comply were clearly established. A right is clearly established when it has a "sufficiently clear foundation in then-existing precedent."[129] The rule must be "dictated by controlling authority or a robust consensus of cases of persuasive authority."[130] "There does not need to be a 'case directly on point,' but existing precedent must place the statutory or constitutional question 'beyond debate.'"[131] The right cannot be defined with a "high level of generality."[132] This particularly is so

---

[126] Dockets 54-2; 54-5; 54-7; 54-8.
[127] Qualified immunity is only an immunity from suit for damages, not immunity from suit for declaratory or injunctive relief. *L.A. Police Protective League v. Gates*, 995 F.2d 1469, 1472 (9th Cir. 1993).
[128] *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotations omitted).
[129] *Nunes v. Arata, Swingle, Van Egmond & Goodwin (PLC)*, 983 F.3d 1108, 1112 (9th Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)).
[130] *Id.* (quoting *Wesby*, 138 S. Ct. at 589–90).
[131] *Id.* (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)).
[132] *Id.*

when the circumstances involve quick judgments made by officials in uncertain and rapidly evolving circumstances, or when an outcome is otherwise highly fact dependent.[133]

  With due consideration of the case law discussed in the preceding sections, the Court finds that the First Amendment violation in these circumstances was clearly established and would have been known to any reasonable government official. It is beyond debate based on Supreme Court precedent that it is unconstitutional to require non-policymaking employees to signal a commitment to a political agenda in order to retain their jobs. The purpose and effect of Defendants' employment practice was the same as in the seminal cases discussed above, placing Defendants on notice that their resignation plan triggered application of these long-standing precedents. It is not the specific details of the patronage practice that matter in the application of the case law; rather, it is whether the practice would interfere with an employee's political beliefs or otherwise inhibit the political activities of public employees. That effect is beyond debate here. As noted above, the nature of the demand was political. As a condition to retained employment, employees had to offer a resignation that represented a commitment to serve under a new governor and to support his political agenda. Those that did not want to signal support of the governor's political agenda would be fired. For those who gave the ostensible pledge of support, the demand admittedly served as a warning that they were replaceable and that they

---

[133] *Id.* at 1112–13; *Gilbrook v. City of Westminster*, 177 F.3d 839, 867 (9th Cir. 1999).

worked for the new governor, which reasonably could be interpreted as a warning against political dissent in the state workforce. This warning would be expected to chill employees' political affiliations and activities that officials would consider subversive to the administration's agenda. The Supreme Court has repeatedly stated that employment practices with this effect inhibit the right to free association.

It also is clearly established that a government employer may not terminate a non-policymaking employee based upon his expressive conduct absent an appropriate government interest. It is without question that Plaintiffs' terminations for refusing to resign runs afoul of this law. The Ninth Circuit has specifically held that when an employee intends to convey an implicit message of disapproval of an official's activity by refusing to facilitate or participate in that activity, and the message relates to a political matter, it is speech that implicates the First Amendment.[134] In *Nunez*, the plaintiff was a court administrator who was instructed by a judge to limit attendees at training seminars to those employees who had worked on the judge's campaign. In protest of the directive, the plaintiff arranged for two employees who did not work on the reelection campaign to attend a training seminar and consequently was fired. The Ninth Circuit found that the plaintiff's refusal to comply was an implicit repudiation of the judge's discrimination against other employees and therefore was expressive

---

[134] *Nunez,* 169 F.3d at 1227–28 (holding that an employee's refusal to limit attendees at training seminars to those court employees who had worked on her supervisor's reelection campaign was expressive conduct on a matter of public concern); *Thomas,* 379 F.3d at 809 (recognizing that a plaintiff's refusal to acquiesce to a supervisor's treatment of another employee—by promoting that employee against the supervisor's wishes—with an intention to convey her disapproval of the supervisor's unlawful retaliation against that employee would be protected expressive conduct).

conduct that touched upon a matter of public concern. The evidence in that case demonstrated that the plaintiff intended to convey a message of disapproval and that her intention was understood by others. The same situation is presented on the record here. Plaintiffs' refusal to resign was intended to convey disapproval of the political nature of the demand and was communicated as, and understood to be, an act of protest. The political nature of Plaintiffs' message was obvious, and the law clearly established that the resignation request could not be considered part of their duties at API. Furthermore, while the issue of the government's interest in these free speech cases can hinge on disputed facts about the nature and extent of any workplace disruption, no such government interest has been asserted here. Therefore, the Court cannot conclude that the situation presented some fact-sensitive, content-specific analysis that would make the application of existing case law uncertain.

Defendants assert they are entitled to qualified immunity, at least as to Dr. Blanford's § 1983 claim, because there is no existing case law which would have put them on notice that an employee operating as the head of one of the departments in a state-run hospital could not occupy the role of a policymaker for purposes of the First Amendment. They assert the issue is too fact dependent to clearly be established. This Court disagrees. It is well understood that a non-policymaking public employee cannot be fired for reasons encompassing political speech or affiliation. The established case law makes it clear that determining whether an employee occupies a policymaking position is a matter of that position's particular job duties and requires a showing that political affiliation is a part of those job duties. Here, Defendants asked

for resignations in a manner that the Court has concluded clearly was violative of First Amendment political association rights from almost all at-will employees, without any regard to the particular positions they held. It reasonably would be understood that the requests went to people not occupying policymaking positions, and that their demand would violate at least some employees' First Amendment rights. More specifically, there is no dispute about the nature of Dr. Blanford's job duties, and those duties would have been well known to officials making employment decisions of this nature. As the preceding analysis shows, none of his job duties suggest under the relevant factors that the position of chief of psychiatry at API is one where political consideration would come into play. In other words, Defendants could not have reasonably believed Dr. Blanford occupied a political position in light of his clearly defined and medically related job duties; indeed, there was no actual individual consideration of his position prior to his termination.

**B.**   **Plaintiffs' Free Speech Claim under Article 1, § 5 of the Alaska Constitution**

The Alaska Constitution in Article 1, § 5 protects citizens' right to free speech. Generally speaking, Alaska's public employee free speech cases rely heavily on federal law,[135] but the Alaska Constitution is applied more broadly in protecting speech. [136] Consequently, given the First Amendment violation present in the circumstances here, Defendants' conduct also violated Alaska's free speech

---

[135] *See Wickwire v. State*, 725 P.2d 695, 703 (Alaska 1986); *State v. Haley*, 687 P.2d 305, 312 (Alaska 1984).

[136] *Club SinRock, LLC v. Anchorage*, 445 P.3d 1031, 1037–38 (Alaska 2019).

protections. The Court notes, however, there is no implied private cause of action for damages under the Alaska Constitution unless the case involves flagrant violations where no alternative remedies are otherwise available.[137] Given the Court's ruling in favor of Plaintiffs on their federal § 1983 claim, Plaintiffs cannot seek damages for the state constitutional violation, only declaratory and injunctive relief.[138]

## C.    Good Faith and Fair Dealing

Under Alaska law, all at-will employment is governed by an implied covenant of good faith and fair dealing.[139] The covenant prohibits an employer from terminating an employee for the purpose of depriving the employee of the contract's benefits and from dealing with the employee in a manner that a reasonable person would regard as unfair.[140] "Unfair actions include disparate employee treatment, terminations on grounds that are unconstitutional, and firing that violates public policy."[141] Defendants ask for summary judgment on this claim. They argue that the basis of Plaintiffs' good faith claim is the First Amendment violation, and they contest that any such violation occurred. However, the Court has found in Plaintiffs' favor as to their constitutional claims, voiding Defendants' basis for summary judgment.

Plaintiffs have not moved for summary judgment on this claim. It is unclear from their complaint what additional remedies Plaintiffs seek under this claim

---

[137] *Larson v. State*, 284 P.3d 1, 9–10.
[138] *Id.*
[139] *Mitchell v. Teck Cominco Alaska Inc.*, 193 P.3d 751, 760 (Alaska 2008).
[140] *Id.* at 761.
[141] *Montella v. Chugachmiut*, 283 F. Supp. 3d 774, 780 (D. Alaska 2017) (citing *Crowley v. State*, 253 P.3d 1226, 1232 (Alaska 2011)).

that are not provided for pursuant to their § 1983 claim, and unclear whether Plaintiffs have reason to pursue further litigation on this issue apart from the federal claim.

## V. CONCLUSION

Based on the preceding discussion, Plaintiffs' motion at docket 54 is GRANTED, and Defendants' motion at docket 55 is DENIED. The Court hereby orders as follows:

(1) Plaintiffs are entitled to judgment on their § 1983 claim for damages against Defendant Governor Dunleavy and Defendant Babcock in their personal capacities based upon the First Amendment violation articulated in the Court's order.

(2) Plaintiffs are entitled to judgment on their § 1983 claim for declaratory relief and injunctive relief, to the extent the requested relief is prospective in nature, against Defendant Governor Dunleavy in his official capacity.

(3) Plaintiffs are entitled to judgment on their free speech claim brought under Article I, § 5 of the Alaska Constitution.

Counsel are instructed to promptly confer and then, within 14 days from this order's date, to file a notice that identifies the remaining issues for litigation, including whether Plaintiffs are pursuing their state claim for good faith and fair dealing and what specific injunctive and monetary relief they seek for each claim. The notice also should suggest a schedule for resolving the outstanding issues.

*Blanford, et al. v. Dunleavy, et al.*
Order on Motions for Summary Judgment
Case No. 3:19-cv-00036-JWS
Page 36

Case 3:19-cv-00036-JWS   Document 71   Filed 10/08/21   Page 36 of 37

IT IS SO ORDERED this 8th day of October, 2021, at Anchorage, Alaska.

_/s/ John W. Sedwick_
JOHN W. SEDWICK
Senior United States District Judge